475 A.2d 700

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Roderick Herman FREY, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 17, 1983.

Decided April 13, 1984.

430

John A. Kenneff, Asst. Dist. Atty., Marion E. MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee.

Penn B. Glazier, Lancaster (Court-appointed), for appellant.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

LARSEN,* Justice.

On November 8, 1979, the body of Barbara Jean Frey was found in her automobile in a cornfield in Lancaster County.

* Disposition of this case was delayed pending compilation of proportionality review data by the Administrative Office of Pennsylvania Courts and examination of that data by this Court. *See* pages 443–445, *infra* and Murder of the First Degree Review Form attached as an Appendix to this opinion. The data was compiled and transmitted to this Court in March, 1984.

She had been beaten and shot in the chest and had died from massive hemorrhaging. Barbara Jean's estranged husband, appellant Roderick Herman Frey, confessed that he had hired someone to murder her and was arrested on December 6, 1979 and charged with murder and conspiracy. A jury trial was convened in the Court of Common Pleas of Lancaster County and, on May 14, 1980, appellant was found guilty of murder of the first degree.. The following day, a separate sentencing proceeding was conducted at which the same jury sentenced appellant to death.

The evidence produced at trial discloses the following. Appellant, 43 years of age at the time of trial, and Barbara Jean had married in October, 1956. The couple had two sons who were in their twenties at the time of trial (a third child had died in an automobile accident). For some years, appellant and Barbara Jean had experienced marital difficulties. These difficulties escalated in 1979 and, in October, Barbara Jean filed for divorce. On November 4, 1979, appellant left the marital residence and moved into a trailer-apartment.

In May of 1979, appellant met Charles Zehring through their employment and the two engaged in a series of conversations concerning appellant's wife and marital difficulties. Zehring, a paranoid schizophrenic who collected exotic weaponry and anarchist/survivalist literature, suggested to appellant some two to three months before the homicide that the solution to appellant's problems with his wife was to have Zehring "waste her." One or two weeks before Barbara Jean filed for divorce, appellant made up his mind to have her killed and agreed to pay Charles Zehring $5000 for the murder.

Appellant convinced Barbara Jean that he should get some money as an "advance" (ostensibly for expenses pertaining to his new living quarters) from the upcoming divorce-property settlement and she issued him a check for $5000 drawn from the Colonial Savings and Loan Association. Appellant paid about $3000 to Zehring three or four days prior to November 7, 1979.

On the evening of November 7, Zehring met with appellant at the latter's residence and appellant informed Zehring of Barbara Jean's route to work the next day and the time she would be going to work. It was appellant's understanding at that time that Zehring would be accompanied by another person and that they "were going to rig the car to look like an accident." Notes of Testimony, May 8, 1980 at 711 (reading from appellant's taped statement of December 6, 1979).

In the early morning hours of November 8, 1979, Charles Zehring and Richard Heberlig intercepted Barbara Jean on her way to work and fulfilled the terms of the contract with appellant. The two men ran Barbara Jean off the road, beat her and shot her, and then drove her in the car to a cornfield where they attempted (unsuccessfully) to burn the vehicle. Later that day, appellant met Zehring and paid him the remainder of the agreed-upon contract price.

On December 6, 1979, appellant rendered a full and complete oral and written confession to Troopers Ulrich and Westcott of the Pennsylvania State Police after being advised several times of his *Miranda* rights and after executing a written "rights" and waiver form. Appellant was then arrested and charged with homicide and conspiracy.

At trial, appellant testified in his own behalf to offer his defense. He denied hiring Zehring to kill his wife. He admitted paying Zehring a total of $5000 but explained that these payments were "extortion" payments, i.e. payments made to Zehring to prevent him from harming appellant or appellant's wife and family. Appellant claimed that Zehring had a bizarre interest in his marital problems and in the comings and goings of his wife, and that Zehring had harassed him and made repeated terroristic threats against his wife, himself and his family. Appellant did not deny making the statements to the police on December 6, 1979, but tried to explain the discrepancy between those statements and his trial testimony to his fear of Charles Zehring and because appellant was "not really thinking what I was

answering [on December 6, 1979]." N.T. May 13, 1980 at 1144.

The jury rejected appellant's defense and found him guilty of murder of the first degree for the intentional killing of his wife, Barbara Jean Frey. While appellant does not specifically challenge the sufficiency of the evidence to sustain this verdict, we have nevertheless reviewed the record for sufficiency and find compelling evidence to support the jury's verdict beyond a reasonable doubt.[1]

Immediately after the verdict of guilty was returned, a separate sentencing proceeding was conducted pursuant to section 9711 of the Sentencing Code, 42 Pa.C.S.A. § 9711. The only aggravating circumstance presented to the jury was § 9711(d)(2), namely, that the "defendant paid or was paid by another person or had contracted to pay or be paid by another person or has conspired to pay or be paid by another person for the killing of the victim." The trial court then instructed the jury as to what matters might, if proven, constitute mitigating circumstances (42 Pa.C.S.A. 9711(e) (1–8)) stating:

The defendant has no significant history of prior criminal convictions.

The defendant was under the influence of extreme mental or emotional disturbance.

The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

The youth or advanced age of the defendant at the time of the crime.

The defendant acted under extreme duress or acted under substantial domination of another person.

Any other mitigating matter concerning the character or record of the defendant or the circumstances of his offense.

1. "[T]his Court shall review, in death penalty cases, the sufficiency of the evidence to sustain a conviction of murder of the first degree." *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26–27 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2444, 77 L.Ed.2d 1452 (1983).

N.T. Sentencing Hearing, May 15, 1980 at 1389. The jury was further instructed that it must return a verdict of death if it unanimously found at least one aggravating circumstance and no mitigating, or one or more aggravating circumstances which outweigh any mitigating circumstances. Finding that the aggravating circumstance—the contract killing—outweighed any mitigating circumstances, the jury returned a verdict of death. Upon denial of appellant's post-verdict motions, this appeal was automatically docketed in this Court pursuant to 42 Pa.C.S.A. § 9711(h)(1). We now affirm both the judgment of sentence and the verdict of death.

Appellant raises several issues pertaining to the sentencing proceeding.[2] Our standard of review of sentencing procedures in cases involving convictions for murder of the first degree is set forth in the Sentencing Code, 42 Pa.C.S.A. § 9711(h), which provides:

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

---

[2]. In addition to the issues discussed in text pertaining to the sentencing proceeding, appellant has also alleged numerous other pre-trial, trial and sentencing hearing errors. These issues are: 1) the court erred in denying appellant's motion for a change of venue; 2) the court erred in denying his motion to suppress certain bank records and telephone company records; 3) the court erred in denying his motion to suppress his confessions; 4) the court erred in admitting over objection those portions of his confessions containing hearsay assertions of Charles Zehring; 5) the court erred in refusing his motion for a mistrial due to prosecutorial misconduct; 6) the court erred in refusing to hold the Pennsylvania death penalty statute, 42 Pa.C.S.A. § 9711(c)(1)(iv), unconstitutional for failing to provide any fixed standard for weighing aggravating against mitigating circumstances, for failing to make that standard the "beyond a reasonable doubt" standard, and for casting the risk of non-persuasion of mitigating circumstances upon the defendant; and 7) the court erred in refusing to hold the Pennsylvania death penalty statute *per se* "cruel punishment" as prohibited by Article I, Section 13 of the Pennsylvania Constitution. There is no merit to any of these issues as issues 1–5 lack factual or legal foundation and as issues 6 and 7 have been fully disposed of by this Court in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* — U.S. —, 103 S.Ct. 2444, 77 L.Ed.2d 1452 (1983).

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

Initially, we find the evidence compelling in support of the finding of the aggravating circumstance set forth in § 9711(d)(2), namely, that appellant paid another person, Charles Zehring, $5000 to murder his wife.

Appellant's principle contention concerns the lower court's instructions to the jury on "mitigating circumstances specified in subsection (e) as to which there is some evidence." 42 Pa.C.S.A. § 9711(c)(1)(ii). Specifically, appellant asserts prejudicial error in two instances wherein the court's instructions did not exactly track the language of the Sentencing Code, to-wit:

**42 Pa.C.S.A. § 9711(e) Mitigating circumstances.—**
Mitigating circumstances shall include the following:

\* \* \* \* \* \*

(4) The age of the defendant at the time of the crime.
[actual instruction given to jury: "The <u>youth or advanced</u> age of the defendant at the time of the crime."]
(5) The defendant acted under extreme duress, <u>although not such duress as to constitute a defense to prosecution under 18 Pa.C.S. § 309 (relating to duress)</u>, or acted under <u>the</u> substantial domination of another person.

[actual instruction given to jury: "The defendant acted under extreme duress or acted under substantial domination of another person."]

(underscored portions indicate the deviation from the statutory language)

While we believe the preferrable practice is, ordinarily, to track the language of the Sentencing Code, variations from that language require this Court to vacate a sentence of death *only* where the deviation injects "passion, prejudice or some other arbitrary factor" into the deliberative process which factor produces the sentence of death. 42 Pa.C.S.A. § 9711(h)(3)(i); *see Commonwealth v. Stoyko,* 504 Pa. 455, 468, 475 A.2d 714, 721 (1984). As we stated in *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 49–50, 454 A.2d 937, 955 (1982), *cert. denied,* — U.S. —, 103 S.Ct. 2444, 77 L.Ed.2d 1452 (1983), "the court [is] not required to use the language requested by counsel. *Commonwealth v. Lesher,* 473 Pa. 141, 373 A.2d 1088 (1977) (court free to use its own form of expression; only issue is whether area is adequately, accurately and clearly presented to jury)." A deviation from the language of the statutory instruction or a technical inaccuracy in the jury instruction which nevertheless adequately, accurately and clearly expresses the law to the jury will not invalidate a sentence of death. *Commonwealth v. Zettlemoyer, supra* at 500 Pa. 46–50, 454 A.2d 937. Nor will an erroneous instruction invalidate the sentence unless it "produces" the verdict of death, 42 Pa.C.S.A. § 9711(h)(3)(i), or unless such instruction "so infects the balancing process [of the judge or jury's sentencing determination] that it is constitutionally impermissible [to] let the sentence stand." *Barclay v. Florida,* 463 U.S. 939, 103 S.Ct. 3418, 3427–28, 77 L.Ed.2d 1134 (1983).

As the United States Supreme Court has instructed in *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 2476–47, 77 L.Ed.2d 235 (1983):

Two themes have been reiterated in our opinions discussing the procedures required by the Constitution in capital sentencing determinations. On the one hand ... there

can be "no perfect procedure for deciding in which cases governmental authority should be used to impose death." ... On the other hand, because there is a qualitative difference between death and any other permissible form of punishment, "there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case" ... "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." ... Thus, although not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error. (citations omitted)

Thus, in *Zant*, the United States Supreme Court reversed the Fifth Circuit Court of Appeals which had invalidated a sentence of death imposed by a jury, and upheld by the Georgia Supreme Court, because the jury had erroneously been instructed to consider an aggravating circumstance that had been subsequently declared unconstitutionally vague by the latter court. The existence of other aggravating circumstances had been proven in that case. The United States Supreme Court stated "the erroneous instruction does not implicate our repeated recognition that the qualitative difference between death and other penalties calls for a greater degree of reliability when the death penalty is imposed." *Id.* 103 S.Ct. at 2748 quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). Especially where the state's high court can and will review the sentence and procedure to ensure that the death penalty in each case is warranted, is not imposed in an arbitrary and capricious manner and is not excessive or disproportionate to the penalties imposed in similar cases, "imperfections in the deliberative process" will not necessarily require setting aside a verdict of death. *Id.* 103 S.Ct. at 2747, 2749–50. *See also Wainwright v. Goode*, —— U.S. ——, 104 S.Ct. 378, 78 L.Ed.2d 187 (1983) where the United States Supreme Court upheld a sentence of death, even though, in imposing

the sentence that had been recommended by the jury, the trial judge had considered non-statutory aggravating circumstances, which consideration was improper under Florida law limiting aggravating circumstances to those enumerated in the statute. The Court there held:

> In *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), the Court upheld a death sentence despite the reliance by the trial court on an aggravating circumstance that was improper under state law. The plurality stated that "mere errors of state law are not the concern of this Court, *Gryger v. Burke*, 334 U.S. 728, 731, 68 S.Ct. 1256, 1257, 92 L.Ed. 1683 (1948), unless they rise for some other reason to the level of a denial of rights protected by the United States Constitution." 463 U.S., at —, 103 S.Ct., at 3428. The critical question "is whether the trial judge's consideration of this improper aggravating circumstance so infects the balancing process created by the Florida statute that it is constitutionally impermissible for the Florida Supreme Court to let the sentence stand." *Id.*, at —, 103 S.Ct. at 3427.
>
> We have great difficulty concluding that the balancing process was so infected. A properly instructed jury recommended a death sentence. On direct appeal to the Florida Supreme Court, the court stated that "comparing the aggravating and mitigating circumstances with those shown in other capital cases and weighing the evidence in the case sub judice, our judgment is that death is the proper sentence." *Goode v. State*, 365 So.2d 381, 384–385 (1978). Whatever may have been true of the sentencing judge, there is no claim that in conducting its independent reweighing of the aggravating and mitigating circumstances the Florida Supreme Court considered Goode's future dangerousness. Consequently, there is no sound basis for concluding that the procedures followed by the State produced an arbitrary or freakish sentence forbidden by the Eighth Amendment.

*Id.* at 104 S.Ct. 383.

In the instant case, it is clear that the lower court's technical deviation from the exact language of the Sentenc-

ing Code in the two instances identified by appellant did not impermissibly infect the balancing process nor did it inject an arbitrary factor, passion or prejudice into the deliberations. As to the court's instruction that the jury could consider the "youth or advanced age" of the defendant, as opposed to simply the "age," appellant claims that the court erroneously restricted the scope of the mitigating circumstance in derogation of the legislature's intent. He argues that the legislative intent was to allow the jury to consider a defendant's "middle-age" as a mitigating circumstance as well as his youth or advanced age.

In construing § 9711(e)(4) and in ascertaining the intent of the General Assembly, we presume that the legislature did not intend a result that is absurd or unreasonable. Statutory Construction Act of 1972, 1 Pa.C.S.A. § 1922(1). Moreover, when the language of a provision is not explicit (and "age" is not explicit when the mitigating circumstance is argued to apply to a 42 year old defendant), this Court should consider, *inter alia,* the occasion and necessity for the provision and the object it seeks to attain. *Id.* § 1921(c)(1) and (c)(4). In providing the seven specific and one general circumstances can be considered by the jury in mitigation of aggravating circumstances, that legislature was responding to the constitutional deficiency identified in *Commonwealth v. Moody,* 476 Pa. 223, 382 A.2d 442 (1977). That deficiency "was the failure to permit the jury to consider a sufficiently broad spectrum of circumstances relating to the character of the offender, as well as to the circumstances of the offense." *Commonwealth v. Zettlemoyer, supra* 500 Pa. at 57, 454 A.2d 937. The legislature was also careful to provide sufficiently definite standards to channel the jury's (or judge's) discretion in capital sentencing determinations and thus avoid the danger of the death penalty being imposed in an arbitrary and capricious manner. *Id.* at, 500 Pa. 40, 454 A.2d 937. By so channelling the jury's (or judge's) discretion, the legislature afforded a meaningful basis for distinguishing the cases in which the death penalty is imposed from those in which it is not. *See*

*Lockett v. Ohio,* 438 U.S. 586, 599, 98 S.Ct. 2954, 2962, 57 L.Ed.2d 973 (1978).

██ With the above in mind, we believe the lower court was correct in interpreting § 9711(e)(4) as providing a miti-, gating circumstance of the "youth or advanced age" of the defendant. As the purpose of the aggravating and mitigating circumstances is to narrow the category of cases wherein the death penalty will be imposed and to provide a meaningful basis for distinguishing the cases wherein that penalty is appropriate from those where it is not, "age" cannot be reasonably interpreted so broadly as to encompass *every* defendant. The interpretation urged upon us by appellant would have that unreasonable result. Our society recognizes that, for many purposes, the young and the old are in a category apart from the greater majority of the population—the middle aged. Accordingly, many privileges are granted the young and the elderly, and many privileges are withheld. In directing the jury (or judge) to consider the "age" of the defendant as a possible mitigating circumstance, the legislature simply recognized this distinction. There is no necessity to define the exact parameters of "youth or advanced age" that would qualify a defendant to introduce his age as a mitigating circumstance, for the jury (or judge) is quite capable of drawing its own conclusions. It is enough to say in this case that the fact that defendant was 42 years of age when he committed the crime of murder can in no way be offered as a factor in mitigation of the seriousness of that crime.

██ As to the deviation from the statutory language regarding the mitigating circumstances of "extreme duress," appellant argues that he has been prejudiced by the court's failure to instruct the jury that extreme duress can be a mitigating circumstance even though the evidence of duress in the case in chief was inadequate to constitute a defense to prosecution under 18 Pa.C.S.A. § 309. We disagree. There had been *no* evidence of duress as a defense to an intentional killing presented by appellant at the guilt stage. Appellant's sole defense was *not* that he killed his

wife or paid someone to do it because he was threatened, harassed or coerced to do so, but rather, that he asked Charles Zehring *not to kill* his wife and paid Zehring money to get him to leave appellant and his family alone. In short, the defense was innocence of any involvement in the crime, *not* that extreme duress caused appellant to participate in his wife's murder. In rejecting this defense, the jury obviously disbelieved appellant's versions of his payoffs to Zehring and found him guilty, on overwhelming evidence, of the intentional, wilful, planned and premediated killing of Barbara Jean Frey. While there was some evidence from appellant of threats, harassment and extortion, the evidence did not relate to the act of murder—in fact, it was offered to contradict the prosecution's theory of conspiracy. Additionally, defense counsel extensively covered the mitigating circumstance of extreme duress in his closing argument to the jury at the sentencing proceeding. N.T. May 15, 1980 at 1373–1380.[3] Neither the prosecutor's summation nor the court's address contradicted the defense counsel's position, nor did defense counsel object to the court's instructions. Under these circumstances, therefore, we conclude that while the court's instruction on extreme duress deviated from the language of § 9711(e)(5), the deviation did not so infect the deliberative process as to render the verdict of death constitutionally impermissible nor did it inject into that process any "passion, prejudice or any other arbitrary factor" producing the sentence of death.[4]

**3.** *E.g.:* "Basically what that means is that duress is a mitigating circumstance, and that it does not have to rise to the level of the defense of duress in the case in chief. It can be lesser than that." N.T. at 1373.

**4.** While trial counsel did not raise any objections to the court's instructions at the sentencing phase, there is a limited relaxation of the waiver rules in death penalty cases wherein this Court will address and, if possible from the record, resolve all significant issues perceived by this Court or raised by the parties. *Commonwealth v. Zettlemoyer, supra* at 500 Pa. 50 n. 19, 454 A.2d at 955 n. 19. Appellant also alleges that it was erroneous for the court not to charge as provided in § 9711(e)(7), which provides it shall be a mitigating circumstance that "[t]he defendant's participation in the homicidal act

■ We are also obligated by statute to determine whether the sentence of death imposed in the instant case is "excessive or disproportionate to the penalty imposed in similar cases ...". 42 Pa.C.S.A. § 9711(h)(3)(iii).[5] While the Sentencing Code does not define "similar cases" nor set forth any specific procedures for conducting this proportionality review, this Court conducts an independent evaluation of all cases of murder of the first degree convictions which were prosecuted or could have been prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S.A. § 9711. *Commonwealth v. Zettlemoyer, supra* at 454 A.2d 961.

In order to facilitate our review, this Court has ordered the President Judge of each county to supply to the Administrative Office of Pennsylvania Courts (the AOPC) information pertaining to each such conviction and imposed a continuing obligation on the President Judges to update the AOPC with data pertaining to future cases. This information includes the facts and circumstances of the crimes, the aggravating and mitigating circumstances arguably presented by the evidence, the gender and race of the defendant and the victim, and other information pertaining to the conduct and prosecution of the case. The data will be compiled and monitored by the AOPC to insure that the body of "similar cases" is complete and to expedite our proportionality review. *See* AOPC Review Form attached to this opinion as an Appendix.

■ We have reviewed the information compiled by the AOPC and conclude therefrom that the sentence of death imposed in the instant case is neither excessive nor disproportionate to the penalties imposed in "similar cases", i.e. "contract killing" cases.

was relatively minor." Suffice it to say that appellant's participation was *not "relatively minor."*

5. The United States Supreme Court has recently held that "proportionality review" is not required by the Constitution of the United States in every case in which the death penalty is imposed. *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

■ Appellant further argues that his sentence of death is excessive or disproportionate to the sentences of life imprisonment imposed in two specific cases, namely those of co-defendants Richard Heberlig and Charles Zehring.[6] We do not agree that these cases are "similar" for purposes of proportionality review. The circumstances of appellant's participation in the murder of his wife, the mother of his three children, are qualitatively different from that of Heberlig and Zehring. Appellant was the primary mover in the conspiracy to murder his wife to avoid financial difficulties with the impending property settlement—but for his payments of $5000 to Zehring, Barbara Jean would, in all probability, not have been murdered.

Moreover, the "character and record" of the respective defendants was significantly dissimilar. (None of the three co-conspirators had any significant history of prior criminal convictions.) Heberlig was a relative late-comer to the conspiracy. He waived his right to have a jury determine his sentence and agreed that the judge would establish the sentence. In setting the sentence at life imprisonment, the Honorable D. Richard Eckman decided to "show the defendant, Richard Heberlig, more compassion and mercy than he showed his victim ...." N.T. *Commonwealth v. Heberlig,* May 8, 1980 at 356. Charles Zehring pled guilty to murder generally and the Honorable Wayne G. Hummer, Jr. adjudicated Zehring guilty of murder of the first degree. The court sentenced Zehring to life imprisonment finding mitigating circumstances that this defendant was a paranoid schizophrenic who was abusing amphetamines at the time preceding the crime and had cooperated with the police. The court also stated "the court will show ... the Defendant, Charles David Zehring, Jr., more compassion and mercy than he showed his victim." N.T., *Commonwealth v. Zehring,* September 4, 1980 at 252. Under these circumstances, we do not find the cases of co-conspirators Heberlig and Zehring to be "similar" to appellant's case for purposes of

6. This issue is asserted for the first time in this appeal. For the reasons stated in note 4, *supra,* we shall address the issue.

proportionality review. Moreover, as the United States Supreme Court has made clear, "[n]othing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (Opinion of Stewart, Jr., announcing the judgment of the Court). And, as that Court has more recently pronounced:

> We have never suggested that the United States Constitution requires that the sentencing process should be transformed into a rigid and mechanical parsing of statutory aggravating factors. But to attempt to separate the sentencer's decision from his experiences would inevitably do precisely that. It is entirely fitting for the moral, factual, and legal judgment of judges and juries to play a meaningful role in sentencing. We expect that sentencers will exercise their discretion in their own way and to the best of their ability. As long as that discretion is guided in a constitutionally adequate way, *see Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and as long as the decision is not so wholly arbitrary as to offend the Constitution, the Eighth Amendment cannot and should not demand more.

*Barclay v. Florida, supra* at 103 S.Ct. 3424.

For the foregoing reasons, we conclude that appellant's sentence of death is not excessive or disproportionate to the penalty imposed in similar cases.

Finally, appellant asserts that an aspect of this Commonwealth's criminal procedure—the practice of instructing the jury in a homicide trial, upon request by defendant, as to the elements of all degrees of murder and voluntary manslaughter whether or not evidence exists to support such charges (*see Commonwealth v. Jones*, 457 Pa. 563, 319 A.2d 142 (1974), *cert. denied* 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974))—injects an element of arbitrariness into the sentencing process as that practice invites jurors to disregard their oaths to apply the law to

the evidence presented.[7]  Appellant derives support for this proposition from *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) and *Hopper v. Evans*, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367 (1982).

While appellant does not specifically state that this practice requires this Court to vacate his sentence of death under the standards of review set forth in § 9711(h)(3), his argument would fall within the framework of subsections (i) ("sentence of death was the product of ... any other arbitrary factor") and/or (iii) ("sentence of death is excessive or disproportionate to the penalty imposed in similar cases").  We discussed the Pennsylvania practice in *Commonwealth v. Zettlemoyer*, *supra* at 500 Pa. 67–73, 454 A.2d 937, but did not deem it appropriate at that time to resolve the issue of whether the practice injects an impermissible level of arbitrariness into the sentencing process.[8] The instant case requires that we decide the issue.

As noted in *Zettlemoyer*, *Roberts v. Louisiana*, *supra*, considered Louisiana's "unique system of responsive ver-

7.  Appellant did not object to the court's instructions at the guilt phase nor did he raise this issue in post-verdict motions.  However, we deem it appropriate to address the issue.  *See* note 4, *supra*.

8.  We stated at 500 Pa. 71–72, 454 A.2d 937:

> In the instant proceeding, our review of similar cases does not encompass those cases where a defendant requested, or might have requested, a charge on voluntary manslaughter.  Appellant herein admitted criminal liability for either murder of the first or murder of the third degree.  His defense specifically eschewed any possibility of an instruction on any lesser offense.  It would be inappropriate, therefore, to include cases in the comparison wherein the jury was instructed on voluntary manslaughter in the absence of evidence to support such verdict.  Accordingly, we need not decide whether, in an appropriate case, the Pennsylvania practice (of charging the jury on voluntary manslaughter, upon request, where there is no evidence to support such a verdict) leads to arbitrary and capricious results, or presents a substantial possibility of arbitrariness.

In the instant case, instructions were, in fact, given to the jury on all degrees of murder as well as on voluntary and involuntary manslaughter.  Given appellant's defense of innocence and non-involvement, there was no evidence on the record to support a verdict of murder of the second degree (felony murder) or of either voluntary or involuntary manslaughter.

dicts" wherein the jury in every murder case was instructed on first and second degree murder and manslaughter regardless of the evidence adduced at trial. A plurality of the United States Supreme Court in *Roberts* held that:

> This responsive verdict procedure not only lacks standards to guide the jury in selecting among first-degree murderers, but *it plainly invites the jurors to disregard their oaths and choose a verdict for a lesser offense whenever they feel the death penalty is inappropriate.* There is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to disregard the trial judge's instructions. The Louisiana procedure neither provides standards to channel jury judgments nor permits review to check the arbitrary exercise of the capital jury's *de facto* sentencing discretion. See *Woodson v. North Carolina,* 428 U.S. [280], at 302–303, 96 S.Ct. [2978], at 2990–2991 [49 L.Ed.2d 944].

428 U.S. at 335, 96 S.Ct. at 3007. The plurality did not, however, hold that this practice *alone* rendered the Louisiana death penalty procedures impermissibly arbitrary. Rather, as we stated in *Commonwealth v. Zettlemoyer, supra* at 500 Pa. 69–71, 454 A.2d 937, it seems that

> the Court was influenced in its decision by a combination of factors: the mandatory verdict of death for first-degree murder, the unfettered discretion of the jury to return a lesser offense, coupled with the facts that, in Louisiana, "there are no standards provided to guide the jury in the exercise of its power to select those first-degree murderers who will receive death sentences, and there is no meaningful appellate review of the jury's decision." *Id.* [428 U.S.] at 335–36, 96 S.Ct. at 3007.

That the *combination* of factors—mandatory death sentences for first degree murder, charging on lesser included offenses, lack of sentencing standards/guidelines, and lack of meaningful appellate review—produced the unconstitutional result in Louisiana is apparent from the companion cases of *Gregg v. Georgia,* [428 U.S. 153,

96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) ]; *Proffitt v. Florida,* [428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) ]; and *Jurek v. Texas,* [428 U.S. 262 (1976) ]; In each of those cases, the petitioners had argued that discretionary aspects of the states' criminal justice system, including prosecutorial discretion in charging, plea bargaining, executive clemency and the practice of charging the jury on lesser included offenses, presented the potential evil of arbitrary and capricious decision-making which was condemned in *Furman* and *Bradley.* As Mr. Justice White stated, such a contention "seems to be in the final analysis an indictment of our entire system of justice", *Gregg v. Georgia, supra* [428 U.S.] at 225–26 [96 S.Ct. at 2949–50] (White, J., concurring, joined by the Chief Justice and Rehnquist, J.), and was unacceptable. *Id.* The opinion of Mr. Justice Stewart stated:

First, the petitioner focuses on the opportunities for discretionary action that are inherent in the processing of any murder case under Georgia law. He notes that the state prosecutor has unfettered authority to select those persons whom he wishes to prosecute for a capital offense and to plea bargain with them. Further, at the trial the jury may choose to convict a defendant of a lesser included offense rather than find him guilty of a crime punishable by death, even if the evidence would support a capital verdict. And finally, a defendant who is convicted and sentenced to die may have his sentence commuted by the Governor of the State and the Georgia Board of Pardons and Paroles.

The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman,* in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. *Nothing in any of our cases suggests that the decision to afford an individual*

*defendant mercy violates the Constitution. Furman held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant.*

*Id.* 428 U.S. at 199, 96 S.Ct. at 2937. (Opinion of Stewart, J., announcing the judgment of the Court, joined by Powell and Stevens, JJ.)

The sentencing procedures in Pennsylvania more closely approximate the Georgia, Florida and Texas procedures than those of Louisiana. Juries in Pennsylvania are not mandated to impose the death penalty in all cases of murder of the first degree, and are not left without guidelines in the determination of whether to impose death or life imprisonment. Perhaps the most significant difference between this Commonwealth and Louisiana is this state's provisions for meaningful appellate review for excessiveness and disproportionality in similar cases.

We reaffirm this interpretation of *Roberts* and its companion cases and hold that the Pennsylvania practice challenged by appellant does not inject an impermissible element of arbitrariness into the sentencing process and procedure or encourage capricious results. Unlike in Louisiana, juries in this Commonwealth know, by common knowledge, court instruction and extensive questioning at voir dire, that a separate sentencing proceeding will be conducted in the event that the defendant is convicted of murder of the first degree. Thus, any tendency to disregard the evidence and select a lesser verdict not supported by the evidence in order to dispense "mercy" is greatly diminished if not eliminated. In the sentencing hearing, the jury's (or judge's) discretion is guided by sufficient definitive standards to ensure that the verdict is not arbitrary or capricious and to allow for and facilitate meaningful appellate review. Our review discloses, moreover, no wholesale problem or pattern in juries returning lesser verdicts on cases

wherein those lesser verdicts were unsupported by record evidence. The fact that the existence of the *"Jones"* rule may have resulted, in some few individual cases, in a verdict of a lesser degree of homicide pursuant to the jury's "mercy dispensing powers" does not invalidate the entire system.

Furthermore, it would be anomolous to allow a defendant to request instructions on all degrees of homicide [9] and then complain that the practice requires the vacating of his sentence of death because it introduces an element of arbitrariness into the process. To permit such a result would be to pervert the *Jones* rule which was adopted to benefit the defendant and would place the Commonwealth in an impossible position. This we will not do.[10]

For the foregoing reasons, we sustain the conviction of murder of the first degree and affirm the sentence of death.[11]

It is so ordered.

**9.** It is unclear whether appellant specifically requested the charges on the lesser degrees of homicide. In any event, he certainly did not object to them.

**10.** There is little or no vitality left to this practice which stems from this Court's decisions in *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142, *cert. denied* 419 U.S. 1000, 95 S.Ct. 316, 42 L.Ed.2d 274 (1974) and *Commonwealth v. Manning,* 477 Pa. 495, 384 A.2d 1197 (1978). The continuing validity of the rule was seriously undermined by our decisions holding that an instruction on involuntary manslaughter may be given *only* where the evidence would support such a verdict. *Commonwealth v. White,* 490 Pa. 179, 415 A.2d 399 (1980); *Commonwealth v. Williams,* 490 Pa. 187, 415 A.2d 403 (1980). The death knell to the practice regarding instructions on voluntary manslaughter was sounded in *Commonwealth v. Carter,* 502 Pa. 433, 466 A.2d 1328 (1983) wherein a majority of this Court held that a trial court may charge on the "unreasonable belief" sub-class of voluntary manslaughter, 18 Pa.C.S.A. § 2503(b), only where evidence exists that would support such a verdict. 502 Pa. 433, 466 A.2d 1328. The majority did not decide the propriety of the practice of charging the jury on "heat of passion" voluntary manslaughter, 18 Pa.C.S.A. § 2503(a) in the absence of evidence, 502 Pa. 441 n. 8, 466 A.2d 1331 n. 8, although the concurring opinions of this author and Mr. Justice McDermott would have abolished that practice as well.

**11.** The prothonotary of the Eastern District is directed to transmit, as soon as possible, the full and complete record of the trial, sentencing

451

NIX, C.J., filed a concurring and dissenting opinion.

ROBERTS, former C.J., did not participate in the determination of this case.

## APPENDIX

ADMINISTRATIVE OFFICE OF PENNSYLVANIA COURTS

REVIEW FORM

MURDER OF THE FIRST DEGREE

IN THE COURT OF COMMON PLEAS OF _____ COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA : CASE NO. _____
                                :
            vs.                 :
_____    :

1. Defendant's: (a)  date of birth: _____
                (b)  race: _____
                (c)  sex: _____

2. Victim's:    (a)  date of birth: _____
                (b)  race: _____
                (c)  sex: _____

3. Guilt determined by:  jury ( )
                         trial court ( )
                         guilty plea ( )

4. Was the death penalty sought?  Yes ( )
                                  No  ( )

5. If No. 4 is answered yes,

   (a) sentencing disposition:    death penalty ( )
                                  life imprisonment ( )

   (b) sentence determined by:    jury ( )
                                  trial court ( )

   (c) List all aggravating circumstances, see 42 Pa.C.S. § 9711(d), presented at the sentencing hearing by the Commonwealth and briefly set forth the facts and evidence relevant to each such circumstance:

   _____
   _____
   _____
   _____
   _____

hearing, imposition of sentence, and review by this Court to the Governor.  42 Pa.C.S.A. § 9711(i).

452

(d) List all mitigating circumstances, see 42 Pa.C.S. § 9711(e), presented at the sentencing hearing by the defendant and briefly set forth the facts and evidence relevant to each such circumstance:

_____
_____
_____
_____
_____
_____

6. List all other offenses which were tried at the same trial and indicate which offenses stemmed from or related to the charge of murder of the first degree, and whether defendant was convicted or acquitted on these other offenses:

_____
_____
_____
_____
_____
_____

7. If there were any co-defendants involved in this case, complete the following:
   (a) Name: _____
       Information/Indictment No(s).: _____
       Offenses charged: _____

       Disposition: _____
       Status of case: _____

   (b) Name: _____
       Information/Indictment No(s).: _____
       Offenses charged: _____

       Disposition: _____
       Status of case: _____

   (c) Name: _____
       Information/Indictment No(s).: _____
       Offenses charged: _____

       Disposition: _____
       Status of case: _____

8. Status of case, including date of most recent action:

_____

(E.g., verdict returned on _____ but formal sentencing delayed pending disposition of post-verdict motions; notice of appeal filed on _____; etc.)

9. If any opinions have been written in this case, attach to this Review Form. Otherwise, please forward when available.

10. If a transcript of the sentencing hearing is available in this case, attach a certified copy to the Review Form; if not immediately available, transmit a certified copy to the AOPC upon receipt.

NIX, Chief Justice, concurring and dissenting.

I agree with the majority's conclusion that appellant's conviction of first degree murder must be affirmed. I am constrained to dissent from the majority's affirmance of the sentence of death because I am convinced that Pennsylvania's death penalty statute, as presently written and applied, fails to adequately channel and limit the sentencing jury in the exercise of its discretion.*

> *Furman* [*v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)] mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.
>
> *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976)

To ensure that the death penalty is imposed on the basis of reason rather than caprice or emotion, the United States Supreme court has invalidated procedures that tended to diminish the reliability of the sentencing determination. *E.g., Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (opinion of Stevens, J., joined by Stewart and Powell, JJ.) "The same reasoning must apply to rules that diminish the reliability of the guilt determination." *Beck v. Alabama*, 447 U.S. 625, 638, 100 S.Ct. 2382, 2390, 65 L.Ed.2d 392 (1980).

It has been the practice in this jurisdiction to instruct the jury in a homicide trial, upon request of the defendant, as to all degrees of murder and voluntary manslaughter, whether or not there is any evidence to support such charges. The jury in a capital case thus has the power to dispense mercy

---

* I must reiterate the objection expressed in my dissent in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 81, 454 A.2d 937, 971 (1982), that the death penalty statute fails to express the standard to be applied in determining whether aggravating circumstances "outweigh" mitigating circumstances in a given case. I am not persuaded by the counterarguments that have to this point been offered.

by returning a lesser verdict even where the evidence justifies a finding of first degree murder and could not under any rational view support the verdict rendered. The possibility of such a decision at the guilt-determining stage of the proceedings injects an arbitrary factor into the process of selecting those who may be subjected to the death sentence. A similar practice was a crucial element of the system struck down in *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1926):

> Under the current Louisiana system every jury in a first-degree murder case is instructed on the crimes of second-degree murder and manslaughter and permitted to consider those verdicts even if there is not a scintilla of evidence to support the lesser verdicts. And, if a lesser verdict is returned, it is treated as an acquittal of all greater charges. This responsive verdict procedure not only lacks standards to guide the jury in selecting among first-degree murders, but it plainly invites the jurors to disregard their oaths and choose a verdict for a lesser offense whenever they feel the death penalty is inappropriate. There is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to disregard the trial judge's instructions. The Louisiana procedure neither provides standards to channel jury judgments nor permits review to check the arbitrary exercise of the capital jury's de facto sentencing discretion.

*Id.* at 334–335, 96 S.Ct. at 3006–3007 (citations and footnote omitted).

Although Pennsylvania's system, unlike the one described above, does not provide for an automatic death sentence upon conviction of first degree murder, the element of arbitrariness is nonetheless present. Given two equally culpable defendants, one may be convicted of first degree murder and thereby exposed to the punishment of death, while the other, sheerly at the jury's whim, may be found guilty of a lesser degree of homicide and thus totally avoid

such exposure. Absent the jury's mercy dispensing power, the jury's sentencing decision as to both defendants would be governed by the considerations the legislature has deemed relevant and appropriate. The subsequent restraint of the jury's sentencing discretion comes too late in the process, which has been tainted by the earlier unfettered discretion.