662 A.2d 610

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Salvador Carlos SANTIAGO, Appellant.**

Supreme Court of Pennsylvania.

Argued March 7, 1995.

Decided June 20, 1995.

190

John Elash, Pittsburgh, for appellant.

Robert E. Colville, Dist. Atty., Claire C. Capristo, Deputy Dist. Atty., Scott A. Bradley, Pittsburgh, Robert A. Graci, Chief Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION*

MONTEMURO, Justice.

Appellant, Salvador Carlos Santiago, was tried for the first time before a jury in November 1985. Appellant was charged with one count each of criminal homicide, robbery, and violation of the Uniform Firearms Act.[1] At trial, Appellant presented an insanity defense, but ultimately was found guilty of all charges. The Court of Common Pleas of Allegheny County denied Appellant's motions for post-verdict and supplementary post-verdict relief, and sentenced Appellant to death for first degree murder. Appellant was also sentenced to a consecutive term of imprisonment of ten to twenty years for robbery and two and one-half to five years for violation of the Uniform Firearms Act, to be served concurrently with the sentence for robbery.

---

1. Respectively, 18 Pa.C.S. § 2501(a), 18 Pa.C.S. § 3701(a)(1)(i), and 18 Pa.C.S. § 6106.

Following Appellant's direct appeal to this Court, we vacated the judgment of sentence and remanded the matter to the Court of Common Pleas of Allegheny County for a new trial. *Commonwealth v. Santiago,* 528 Pa. 516, 599 A.2d 200 (1991). We concluded that Appellant's Fifth Amendment right to counsel had been violated when Appellant invoked his right to counsel with regard to a different offense,[2] but was interrogated subsequently by Pittsburgh police with regard to this offense. *Id.* at 522, 599 A.2d at 202–203.

Appellant was tried for a second time on September 8, 1992. At the close of the Commonwealth's case, the trial court granted Appellant's demurrer to the count charging a violation of the Uniform Firearms Act. On September 9, 1992, the jury found Appellant guilty of first degree murder and robbery. In the penalty phase of the trial, the jury unanimously found three aggravating circumstances which outweighed two mitigating circumstances. Appellant's post-verdict motions were denied, and Appellant was sentenced to death for first degree murder and consecutively to ten to twenty years imprisonment for robbery. This automatic appeal follows.

Appellant presents three issues to this Court. First, Appellant contends the trial court erred in admitting the psychiatric testimony of Dr. Robert Wettstein, which was introduced in his first trial where insanity was the defense, because no such defense was proffered on retrial. Second, Appellant asserts that the trial court erred in concluding that Dr. Wettstein was "unavailable," thereby permitting the Commonwealth to introduce the transcript of his prior testimony at Appellant's second trial. Third, Appellant claims his trial counsel was ineffective for failing to cross-examine Dr. Wettstein regarding statements the doctor made in his testimony during Appellant's first trial. Before addressing the merits of these claims, however, we must review the sufficiency of the evidence supporting Appellant's conviction for first degree murder, *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937

2. Appellant was arrested by special agents of the Federal Bureau of Investigation on the charge of unlawful flight to avoid prosecution for the murder of Dean O'Hara.

(1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983), and conduct our statutorily mandated proportionality review. 42 Pa.C.S. § 9711(h)(3)(iii).

Initially, we note that Appellant has not challenged the sufficiency of the evidence supporting his homicide conviction.[3] Nonetheless, we are required to conduct an independent review of the sufficiency of the evidence in every case involving a conviction for first degree murder. *Zettlemoyer,* 500 Pa. at 26 n. 3, 454 A.2d at 942 n. 3 (1982). We must determine whether the evidence and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict-winner, are sufficient to establish all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Rhodes,* 510 Pa. 537, 540, 510 A.2d 1217, 1218 (1986). Circumstantial evidence alone is sufficient to establish a defendant's guilt. *Commonwealth v. Gorby,* 527 Pa. 98, 107, 588 A.2d 902, 906 (1991).

The facts are as follows: On January 17, 1985, at approximately 8:00 a.m., Patrick Huber arrived for work at Minuteman Press, located on Carson Street in the South Side of Pittsburgh. Around 8:30 a.m., Huber left the store and walked down Carson Street to a restaurant called the Pickle Barrel, where he received change and purchased cigarettes. He then left the Pickle Barrel and returned to Minuteman Press.

At approximately 8:40 a.m., Cindy Pasternak, Huber's co-employee, arrived at Minuteman Press and parked behind the building. When she approached the front of the building and looked in the window, she noticed that something was amiss. Specifically, Pasternak testified that the rear portion rather than front portion of the interior of the store was illuminated, and a stranger was in the employee-only area. Pasternak watched the stranger for approximately ten seconds at a distance of about fifteen feet before he noticed her, at which

---

**3.** Nor has Appellant challenged the sufficiency of the evidence supporting his conviction for robbery.

point Pasternak ran to the Pickle Barrel where she remained until the police arrived.[4]

Responding to the radio call was Patrolman Donald Rosenberg, who found Huber lying face down in a utility room in Minuteman Press. Patrolman Rosenberg testified that Huber had a massive head injury to the rear of his head, which was later determined to have been caused by a single bullet. After permitting medical personnel to check the victim, Patrolman Rosenberg secured the building for homicide detectives. A search of the premises revealed that the money which had been left in the cash register overnight was gone.[5]

On January 22, 1985, Pasternak was shown seven photographs, including an older one of Appellant. Police Commander Ronald B. Freeman testified that when Pasternak came to Appellant's picture she stated, " 'That looks like the guy' " or " 'could be the guy. I would know better if I saw him in person.' " (N.T. 9/8/92 at 189). Around May 8, 1985, Pasternak was again shown a photo array, including a recent color photograph of Appellant. Detective James Diskin testified that " 'when she came upon Mr. Santiago's photograph, she said she was positive this was the man she saw in the Minuteman Press on January 17 of 1985.' " (N.T. 9/8/92 at 157–158). Pasternak also identified Appellant in court during his trial as the man she had seen in Minuteman Press on the day Huber was murdered.

Finally, the Commonwealth introduced testimony from Appellant's first trial given by Dr. Robert Wettstein, a forensic psychiatrist who had been appointed to assist in the preparation of Appellant's insanity defense.[6] This former testimony

---

4. The record does not indicate who contacted the police, although it is clear that Pasternak did not place the call.

5. The trial court opinion noted that although no identifiable fingerprints were found, the same fabric print was lifted from the door and a cash register key. *Trial Court Opinion* at 3–4. However, there is no evidence in the record to connect these fabric prints to the Appellant. *See* N.T. 9/8/92 at 169–170.

6. Appellant contests the admissibility of this evidence in his first issue presented to this Court. However, because we conclude that the

established that Dr. Wettstein had four meetings with Appellant between 1985 and 1986. Although Appellant denied any involvement with Huber's murder during the first three meetings with Dr. Wettstein, Appellant did admit his participation during the final meeting. The following colloquy between Dr. Wettstein and the district attorney from Appellant's first trial was read into evidence:

Question: What did [Appellant] indicate happened on [January 17, 1985]?

Answer: He indicated to me that he had been hearing this voice and that the voice had instructed him with regard to killing the victim ...

Question: Was there anything else about the incident that he would confide in you?

Answer: Not on that day.

Question: He just said it's some man, a voice, a male voice talked to him and that's why he did the killing?

Answer: Yes.

(N.T. 9/8/92 at 247–248).

■■■■ On the basis of the standard articulated above, we conclude that the evidence presented is sufficient to sustain Appellant's conviction for the first degree murder of Patrick Huber. We have also conducted the proportionality review required by 42 Pa.C.S. § 9711(h)(3)(iii) and as explicated by this Court in *Commonwealth v. Frey*, 504 Pa. 428, 443–445, 475 A.2d 700, 707–709 (1984). Based upon our review of data from the Administrative Office of Pennsylvania Courts, we find that the sentence of death imposed upon Appellant is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and record of the defendant. 42 Pa.C.S. § 9711(h)(3)(iii); *Frey*, 504 Pa. at 443–445, 475 A.2d at 707–709.

Turning to the three issues raised herein, Appellant first contests the admission of Dr. Wettstein's psychiatric testimo-

admission of this evidence was proper, it may be assessed in our sufficiency review.

ny from Appellant's first trial, where he pursued an insanity defense, into evidence at his second trial, where he did not pursue an insanity defense. Appellant asserts the admission of Dr. Wettstein's prior psychiatric testimony is barred by this Court's decision in *Commonwealth v. Breakiron*, 524 Pa. 282, 571 A.2d 1035 (1990).

In *Breakiron*, the defendant was convicted of first degree murder and sentenced to death. In preparation for his defense, defendant underwent psychiatric evaluation to determine the viability of an insanity defense. Pursuant to Pa. R.Crim.P. 305C(2)(a), the Commonwealth was permitted to discover the results of the evaluation. This rule provides, in pertinent part, as follows:

> In all court cases, if the Commonwealth files a motion for pretrial discovery, the court may order the defendant, subject to the defendant's rights against compulsory self-incrimination, to allow the attorney for the Commonwealth to [discover] ... results or reports of physical or mental examinations .. which the defendant intends to introduce as evidence in chief, or which were prepared by a witness whom the defendant intends to call at the trial, when results or reports relate to the testimony of that witness....

Pa.R.Crim.P. 305C(2)(a). Following the Commonwealth's discovery of these reports, the defendant decided not to present an insanity defense and the reports were not used at trial. Pa.R.Crim.P. 305C(2)(a).

On direct appeal to this Court, defendant argued "that allowing the Commonwealth access to the results of psychiatric examination which he indicates he intends to use, but then decides not to use in his case in chief, chills his right to investigate the defense at all." *Breakiron*, 524 Pa. at 293, 571 A.2d at 1040. We disagreed and held as follows:

> The necessary implication of this rule allowing the Commonwealth access to these reports is that if the defendant changes his mind about using the reports after they have been made available to the Commonwealth pursuant to Rule 305, the Commonwealth may not introduce the reports into

evidence or refer to the reports if the defendant does not
... If the Commonwealth may not use any such evidence
at trial, the existence of the evidence is not impermissibly
harmful to the defendant. The Commonwealth frequently
has in its possession inculpatory evidence which is inadmis-
sible except in special circumstances, and this is not deemed
to violate the rights of a defendant.

*Id.* at 293–294, 571 A.2d at 1040.

■ Appellant argues that under *Breakiron,* the Common-
wealth's mere possession of Dr. Wettstein's testimony pursu-
ant to Rule 305C(2)(a) does not *a priori* permit its admission
by the Commonwealth at trial. Rather, such testimony is only
admissible after a defendant presents an insanity defense (or
puts his mental state otherwise in issue) in his case in chief.
Thus, Appellant contends, Dr. Wettstein's testimony was im-
properly admitted because he did not present an insanity
defense in his case in chief at his second trial.

We disagree. The defendant in *Breakiron* never pursued
an insanity defense at trial; he merely contested the Common-
wealth's possession of reports relating to his mental state
under Rule 305C(2)(a). Herein, Appellant did pursue an
insanity defense and had Dr. Wettstein testify on his behalf at
his first trial. Moreover, although the Commonwealth ob-
tained the evidence of Appellant's admission to Dr. Wettstein
pursuant to Rule 305C(2)(a) at the first trial, at the second
trial the Commonwealth possessed the evidence as a result of
its voluntary disclosure by Appellant at his first trial.[7] Hence,
the limitations of Rule 305 are inapplicable to this case.

■ We also conclude that because Appellant voluntarily
waived the psychiatrist-patient privilege, 42 Pa.C.S. § 5944,[8]

7. If Appellant had decided to forego an insanity defense at his first trial,
the admissions made by Appellant to Dr. Wettstein would not have been
admissible in a subsequent trial unless Appellant pursued an insanity
defense. Pa.R.Crim.P. 305C(2)(a).

8. The privilege provides:

No psychiatrist or person who has been licensed under the act of
March 23, 1972 ... to practice psychology shall be, without the
written consent of his client, examined in any civil or criminal matter

by pursuing an insanity defense in his first trial, he may not reclaim the privilege in a subsequent trial. Our decision in *Commonwealth v. Boyle,* 498 Pa. 486, 447 A.2d 250 (1982), is instructive on this point.

In *Boyle,* the defendant testified in his own behalf at his first trial. Boyle was convicted, but was granted a new trial. At his second trial, the Commonwealth was permitted to introduce portions of Boyle's testimony from his first trial which evidenced Boyle's consciousness of guilt, although the testimony did not constitute an admission per se. Boyle argued that because he did not testify at his second trial, the admission of his former testimony violated his right to silence.

This Court disagreed, stating: "It has long been recognized that testimony from an earlier trial may be introduced in the prosecution's case against a defendant regardless of whether that defendant takes the stand or not in the second proceeding." *Id.* at 497, 447 A.2d at 256. Furthermore, while a defendant cannot be compelled to testify against himself, if a defendant does so voluntarily, " 'he cannot object to having it used against him. His constitutional privilege, as far as that testimony is concerned, is waived, and cannot be reclaimed in any subsequent trial of the same indictment.' " *Id.* at 498, 447 A.2d at 256 (quoting *Commonwealth v. House,* 6 Pa.Super. 92, 104 (1987)).

▮ The purpose of the psychiatrist-patient privilege is to protect confidential communications between the mentioned parties; it is not designed to protect that which is voluntarily disclosed. *Commonwealth v. Goldblum,* 498 Pa. 455, 464, 447 A.2d 234, 239 (1982). Like the defendant in *Boyle* who waived his privilege against self-incrimination by testifying in his first trial, Appellant voluntarily waived the psychiatrist-patient privilege when he decided to pursue an insanity defense in his

as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.
42 Pa.C.S. § 5944.

first trial. Appellant cannot now use a new trial to reclaim the privilege.

■ Appellant next argues that permitting the Commonwealth to read portions of Dr. Wettstein's former testimony into evidence at Appellant's second trial was error because the doctor was not "unavailable" under the common law exception to hearsay for prior testimony. *Commonwealth v. Graves*, 484 Pa. 29, 398 A.2d 644 (1979). This exception permits prior testimony to be admitted when a witness, who is physically available and competent, becomes legally "unavailable" due to partial or full memory loss. *Id.* at 37–38, 398 A.2d at 648–649; *compare* 42 Pa.C.S. § 5917 ·(governing the admissibility of former testimony of a person who has died, or who cannot be produced for trial, or who is legally incompetent). Appellant asserts that the exception was improperly applied in this matter because Dr. Wettstein's memory loss was not caused by his inability to remember the pertinent events, but by his reluctance to testify. The record, however, indicates otherwise.

Dr. Wettstein first appeared as a witness in connection with Appellant's second trial at a pre-trial hearing. At the hearing, Dr. Wettstein testified that he had no independent recollection of his conversations with Appellant and was relying upon his notes from those sessions:

Q [by the Commonwealth]: Your first contact with [Appellant], that would have been in November of 1985; is that correct?

A: According to the notes—and I have no independent recollection of anything probably that we're going to discuss today. I'll be referring to my notes. The first interview I had with him was on November 8th, 1985.

(N.T. 4/29/92 at 79). Later in his pre-trial testimony, Dr. Wettstein again indicated his lack of memory:

Q: Doctor, can we assume from what you've indicated so far that you clearly have no clear independent recollection of any conversation with [Appellant]?

A: No, I do not.

*Id.* at 85. Dr. Wettstein also declined the judge's invitation to review his prior testimony: "I don't think if I read the transcript at length I'm going to remember any more than I remember now ... even if I'm to testify, I'll be able to say what's in the testimony or what's in my notes. I'll have nothing else to say." *Id.* at 91.

Moreover, as the following colloquy between the district attorney and Dr. Wettstein at trial indicates, Dr. Wettstein did not have a present independent recollection of his meetings with Appellant in 1985:

Q. Do you have today a present recollection of your interviews with Mr. Santiago?

A. No.

Q. Have you at the request of myself and others examined your notes, your prior testimony and your reports to see if that might refresh your recollection about the contents of those interviews with Mr. Santiago?

A. Yes. I've done that.

Q. And has that refreshed your recollection about the content of those interviews?

A. No, it has not.

Q. You know you had those interviews, right?

A. Yes.

Q. You just don't recall their content?

A. That's right. So many years have passed now.

Q. Having read through specifically testimony that you have given about those interviews, you also know that you have previously testified about the content, correct?

A. Yes.

Q. But it just doesn't help you remember what the content was?

A. That's right. I only know what's in those records.

(N.T. 9/8/92 at 239–240). Based on this testimony, we find that the trial court correctly concluded that Dr. Wettstein was "unavailable" under the common law exception to hearsay for prior testimony.

In his final claim, Appellant argues that his trial counsel was ineffective for failing to cross-examine Doctor Wettstein regarding his inability to recall the details of his meetings with Appellant. He also asserts counsel was ineffective for not recalling Dr. Wettstein after his prior testimony was read into the record. Appellant contends that the doctor's testimony consisted mainly of paraphrased impressions, which were confusing and subject to interpretation by the jury. As a result of these alleged errors, Appellant claims he was denied a fair trial.

In order to prevail on a claim of ineffectiveness, "Appellant must establish that the underlying claim is of arguable merit, counsel's course of action lacked any reasonable basis for advancing his client's interests, and Appellant has suffered prejudice as a result." *Commonwealth v. Griffin,* 537 Pa. 447, 457, 644 A.2d 1167, 1172 (1994). The burden of proving that counsel was ineffective lies with Appellant. *Commonwealth v. Miller,* 494 Pa. 229, 233, 431 A.2d 233, 235 (1981). Appellant has failed to meet this standard.

With regard to Appellant's complaint that trial counsel should have cross-examined Dr. Wettstein regarding his inability to recall his interviews with Appellant, we note that Appellant fails to explain what further evidence would have been obtained or what purpose such cross-examination would have served. Moreover, we cannot discern any reason for such cross-examination. Dr. Wettstein was called by the *defense* during the sentencing phase in order to testify regarding Appellant's mental state at the time of Patrick Huber's murder; focusing on the doctor's inability to recall his meetings with Appellant would only have impaired the defense's attempt at establishing mitigating circumstances.

With regard to Appellant's claim that Dr. Wettstein should have been recalled for cross-examination regarding the meaning of his former testimony, we must again wonder what such an examination would have achieved, as Appellant fails to tell us. Given Dr. Wettstein's obvious inability to recall the details of his interviews with Appellant, we find it difficult to

understand how Appellant expected Dr. Wettstein to illuminate his former testimony. Furthermore, the jury was made aware of the fact that Dr. Wettstein's prior testimony was based upon paraphrases of what Appellant had revealed during their interviews, and that Appellant had not explicitly admitted that he had murdered Patrick Huber. (N.T. 9/8/92 at 249–250). As such, we find that the underlying claims upon which Appellant relies to establish ineffectiveness of counsel have no merit, and Appellant's claim must fail.

Accordingly, the order of the Court of Common Pleas of Allegheny County is affirmed.[9]

MONTEMURO, J., is sitting by designation.

9. The prothonotary of the Supreme Court is directed to transmit a full and complete record of the trial, sentencing hearing, imposition of sentence and review by this court to the Governor of Pennsylvania. 42 Pa.C.S. § 9711(i).