Roderick Herman **FREY,** Appellee,

v.

Thomas A. **FULCOMER,** Warden,
State Correctional Institution
at Huntingdon, Appellant.

No. 91–1344.

United States Court of Appeals,
Third Circuit.

Argued Nov. 21, 1991.

Decided Aug. 20, 1992.

Rehearing Denied Sept. 15, 1992.

**350**

Henry S. Kenderdine, Jr., John A. Kenneff (argued), Office of Dist. Atty., Lancaster County, Pa., Lancaster, Pa., for appellant.

Penn B. Glazier, Lancaster, Pa., Louis M. Natali, Jr. (argued), Temple University Law School, Philadelphia, Pa., for appellee.

Before: BECKER, GREENBERG, and COWEN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

Thomas Fulcomer, the warden of a Pennsylvania state prison, appeals from an order of the district court for the Eastern District of Pennsylvania granting a writ of habeas corpus to a death row inmate, appellee Roderick Frey. A jury in Pennsylvania state court had convicted and sentenced Frey to death for the contract murder of his estranged wife. Frey unsuccessfully appealed his conviction and sentence and was rebuffed in two subsequent attempts to obtain post-conviction relief in the Pennsylvania courts. He then petitioned for habeas corpus relief in federal district court under 28 U.S.C. § 2254 (1988). The district court ruled that none of Frey's challenges to his conviction were meritorious, but held that he had received ineffective assistance of counsel at the sentencing stage and that the trial court had improperly admitted the testimony of witness Shar-

on Bowers at that stage. The district court therefore vacated Frey's death sentence, without prejudice to Pennsylvania's right to sentence him to life imprisonment or to conduct a new sentencing hearing.

We conclude that Frey was not denied due process by the admission of the Bowers testimony. As to the ineffective assistance claim, the performance of Frey's counsel at the death penalty phase was, as Pennsylvania concedes, deficient in several respects. Among other things, Frey's attorney, who was handling the sentencing stage of a capital case for the first time, read from and argued based upon a Pennsylvania death penalty statute that had been held unconstitutional three years earlier, largely because it had overly restricted a defendant's ability to argue mitigating circumstances. The first prong of the test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), was thus satisfied, and hence we must decide whether Frey has shown sufficient prejudice to meet the second prong of *Strickland*. That is, the case turns on the existence of a "reasonable probability" that Frey's jury would have given him a life sentence if he had had effective assistance of counsel.

Undoubtedly, Frey's counsel could have and should have made a stronger argument on mitigating factors by using the proper statute as his frame of reference. In particular, he should have argued that statutory mitigating circumstances not recognized in the superseded statute, including Frey's lack of a prior criminal record and his "substantial domination" by a coconspirator, helped outweigh the aggravating circumstance of contract murder. Frey's lawyer only indirectly raised Frey's lack of a criminal record, and although he argued the facts supporting "substantial domination" quite forcefully, he did so under the rubric of "duress," a similar but presumably slightly more difficult to prove mitigating factor.

 On the other hand, the prosecutor openly conceded that Frey's lack of a criminal record was a mitigating factor. More-

over, defense counsel, despite laboring under the wrong statute, still managed to introduce all the evidence supporting findings of "substantial domination" and other "miscellaneous" statutory mitigating factors, although he did not neatly dovetail the arguments into the revised statute. Furthermore, the trial judge properly instructed the jury as to which aggravating and mitigating factors to consider and how to balance them, and the evidence suggests that the jury understood the law correctly.

Under these circumstances, we conclude that although it is theoretically possible that, if Frey had had proper assistance of counsel, the jury would have sentenced him to life imprisonment, that outcome was not "reasonably probable." We will therefore vacate the order of the district court granting habeas corpus, and will remand the case for that court to consider those of Frey's claims that it has yet to pass upon.[1]

## I. FACTS AND PROCEDURAL HISTORY

### A. The Crime

Roderick and Barbara Frey were married in 1956 and had three sons, one of whom died in an automobile accident in late 1977. By 1979, the Freys' relationship had become strained. Mr. Frey openly spoke of his desire for a divorce but expressed concern that the settlement would be a severe financial drain on him.

As part of his duties as a truck driver for the Turkey Hill dairy, Mr. Frey made deliveries to a Turkey Hill convenience store managed by Charles Zehring, whom the Pennsylvania Supreme Court has described as "a paranoid schizophrenic who collected exotic weaponry and anarchist/survivalist

literature," *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700, 702 ("*Frey I*"), cert. denied, 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984). Some time in mid–1979, Mr. Frey told Zehring of his woes, and Zehring agreed to serve as a private detective to surveil Mrs. Frey. Evidently, however, Mrs. Frey, unlike Mr. Frey, was not indulging in extramarital affairs, and Zehring therefore suggested that, instead of proceeding with a financially unattractive divorce, Mr. Frey might have Mrs. Frey killed in a manner that made her death appear accidental.

Although the Freys subsequently attempted to reconcile, in October 1979 Mrs. Frey sued for divorce, and Mr. Frey moved out of their home. At about that time, Mr. Frey and Zehring agreed that Mr. Frey would pay Zehring $5000 to murder Mrs. Frey, $3000 in advance and the remainder when the deed was done. As the district court wryly put it, "[i]n a display of sensitivity which no doubt later contributed to the verdict and sentence, [Mr. Frey] financed the transaction by borrowing the money from his wife, against their future property settlement."

Although Zehring arranged most of the details of the murder, Mr. Frey was crucially involved in at least some of the planning.[2] To be certain where Mrs. Frey would be at the time of the attempted murder, Mr. Frey asked Mrs. Frey to meet him very early in the morning of November 8, 1979 at the Turkey Hill convenience store where she worked, so that she could deliver some luncheon meat that she was to slice for him. Mr. Frey advised Zehring of Mrs. Frey's probable route and the time of her journey to the store. Mr. Frey then

---

1. In the district court, Frey also challenged the adequacy of the proportionality review conducted by the Pennsylvania Supreme Court. Additionally, he raised constitutional challenges based on the alleged fact that murder defendants in Lancaster County who waive their right to a jury trial invariably receive life imprisonment, while juries tend to impose death sentences. The district court's opinion mentioned but did not reach these issues, and Frey may have raised others. The parties have not argued those issues before us, and we express no view on them.

2. Apparently Zehring, with Frey's approval, made two separate attempts on Mrs. Frey's life. Zehring had originally arranged an attempt with another person (whose identity remains unknown), but that attempt failed when Zehring and his accomplice were unable to locate their victim. Mr. Frey also approved the second (successful) attempt. Because Frey's jury was never told of the first attempt, it is not relevant to our decision.

spent part of the evening before the planned murder engaging in intimate relations with his girlfriend (also a Turkey Hill employee), and later met with Zehring to ensure that arrangements were set for the murder.

To assist in the murder, Zehring recruited a young ex-Coast Guardsman named Richard Heberlig in exchange for $500. Zehring apparently misled Heberlig to believe that the two would merely beat up the victim in order to collect a debt. By the time that the two actually set out at approximately 4:00 a.m. on the morning of November 8, 1979, however, Heberlig was aware that murder was planned. Shortly thereafter, Zehring and Heberlig, posing as police officers, encountered Mrs. Frey's car on the highway near her home, pulled her over to the side of the road, and approached her. The plan had been to beat Mrs. Frey into unconsciousness and then to stage an automobile accident. When Mrs. Frey remained conscious despite severe beating, however, Heberlig panicked and shot her in the chest. The two men moved her and her car to a cornfield some distance away and attempted unsuccessfully to set fire to the car. Mrs. Frey was later discovered dead from massive hemorrhaging.

After the crime, Zehring met with Mr. Frey and received the final payment for the contract killing. When Mrs. Frey failed to appear for work, the police began inquiries. Mr. Frey denied involvement, but the police were suspicious based on an examination of Mrs. Frey's bank records, which revealed a substantial payment to him shortly before the murder. Mr. Frey at first attempted to explain that he had gambled away the money (which he no longer possessed), but on December 6, 1979, he gave a detailed confession, implicating Zehring, who in turn fingered Heberlig. All were arrested and charged with murder and conspiracy.

### B. *Frey's Trial and Sentencing Hearing*

Notwithstanding his confession, Frey elected to stand trial in the Court of Common Pleas of Lancaster County, which lasted several days. Because the guilt phase is not at issue here, we summarize only the testimony that remained especially relevant at the sentencing phase.

The prosecution's case was extremely strong. It relied primarily on Frey's voluntary confession to the police. It corroborated this with extensive evidence of Zehring's perpetration of the crime (Heberlig was barely mentioned and was referred to as "Mr. X"), circumstantial evidence (including bank and phone records) that Frey had paid Zehring to commit it, and evidence of Frey's motive.

The defense first called several inmates from the Lancaster County Prison, who testified that, while in prison, Zehring had boasted that he had set up the murder scheme in order to extort money from Frey, and that he intended to kill Frey once he had milked Frey for all the money that he could obtain, including money that came to Frey upon his wife's death. Those witnesses also testified that Zehring appeared crazed.

The defense also called a psychologist, Dr. Bruce Wittmaier, who testified in great detail. Wittmaier had interviewed Frey in prison and had given him various psychological tests. Wittmaier testified on direct examination that Frey has a 91 I.Q., which is at the low end of the normal range, and that he tends to be submissive, noncompetitive, and unemotional. Wittmaier also opined that Frey's statement to the police would have been given under stress, in which condition he would be unlikely to stand up for himself, and would be quite likely to feel intimidated and to go along with others' suggestions. On the other hand, Wittmaier conceded on cross-examination that Frey's test scores were statistically abnormal in only three of over twenty categories: a high mark for harm avoidance (he is not a risk taker), a low mark for defendence (he tends not to defend himself), and a low mark for exhibition (he eschews public attention).

Wittmaier's testimony on direct examination was intended to dovetail with that of Frey himself, who recanted his confession to the police.[3] Frey admitted that he had paid Zehring $5000 but explained that the payments were extortion payments to Zehring to prevent him from harming the Frey family. Frey suggested that Zehring had harrassed him and repeatedly threatened to harm him, his wife, and their family. Although Zehring and Heberlig were available, neither side called them to testify.

The Commonwealth briefly called several witnesses in rebuttal. Closing arguments followed, during which the Commonwealth again read extensively from the transcript of Frey's confession. After instructions from the trial judge, the jury retired shortly before 10 a.m. on Friday, May 14, 1980. Shortly after 4 p.m. that day, the jury returned, having found Frey guilty of first degree murder.

The sentencing hearing before the same judge and jury began shortly thereafter. Because its events are essential to our decision, we recite them in detail. The Commonwealth proceeded first, and proposed to call as a witness Sharon Bowers, an acquaintance of both Freys who had not appeared during the guilt phase. The Commonwealth explained that it had only become aware that Bowers had knowledge about the case the day before, after it had rested its guilt phase case-in-chief. It had attempted to call Bowers on rebuttal during the guilt phase, but the trial judge had refused, apparently because her availability at that time was uncertain. This time Bowers was present, and the trial judge allowed her to testify, specifically ruling that it was proper for the Commonwealth to counter the expected defense theory that Zehring had dominated Frey.

Bowers, who was under the misapprehension that she was testifying at the guilt phase, testified that she knew Frey well because he frequently delivered dairy products to her Turkey Hill store, and recounted that he chronically complained about his marital problems. She specifically recalled one conversation in May or June of 1979 when Frey said, referring to his wife, that "I would kill the son of a bitch [sic] if I knew I could get away with it." Bowers testified that she responded, "Oh come on, Rod, you don't mean that," and he replied "Yes, I do," and explained that his wife "couldn't enjoy her money."

Frey's trial counsel, James Sorrentino, then put on his sentencing defense. Sorrentino called Frey's mother, father, and brother, who briefly testified that, based on their knowledge of Frey's personality, Frey could not have cold-bloodedly paid to have his wife killed unless he was under coercion or duress. Frey's father also testified that his son had "never been in trouble before in his life." Sorrentino then briefly called Frey himself back to the stand. Frey asserted that his guilt phase testimony that Zehring had threatened him and his family (including one incident where Zehring held a flashlight and gun in his face) was true. He also stated that he had never told Bowers that he would kill his wife if he could get away with it.

After a dinner break, Sorrentino made his closing argument. His presentation was in large part a reading from what he erroneously thought was Pennsylvania's death penalty statute, supplemented with his commentary thereon. At one key juncture, he erroneously told the jury that if it found a mitigating circumstance, Frey should be sentenced to life imprisonment. He then told the jury what were, in his opinion, the only aggravating and mitigating circumstances that pertained to the case. The relevant aggravating circumstance, he related, was contract murder, and the relevant mitigating circumstances were "two, perhaps only one": (1) age, lack of maturity, or youth of the defendant; and (2) duress not sufficient to be a complete defense to the crime.

---

**3.** The defense had earlier called several character witnesses, who had testified to Frey's reputation for telling the truth and being law abiding.

Effectively abandoning the age factor for the obvious reason that Frey was forty-two years old at the time of the murder, Sorrentino focused on the second factor, duress, emphasizing that the jury should find that Zehring threatened and coerced Frey.[4] In support of that theory, Sorrentino recited not only Frey's testimony but also Zehring's statements to other prisoners that he intended to extort Frey's money and then kill him. Sorrentino also briefly adverted to the testimony of the psychologist as to Frey's I.Q. and his susceptibility to pressure.

The Commonwealth then gave its closing, politely noting that it had "a little different understanding of what this death penalty law says." The prosecution argued that the jury had already concluded that Frey took part in a contract murder, but it candidly admitted the presence of at least one mitigating circumstance, Frey's lack of a significant criminal record, which Sorrentino had failed to highlight in summation. The prosecution did contest duress, however, arguing that Frey's statements in his confession indicated that the contract murder was his own decision. It also stressed that, contrary to Sorrentino's assertion that the presence of a mitigating circumstance ended the inquiry, once the jury also found an aggravating circumstance, the jury was required to balance all the aggravating and mitigating circumstances. As to that balance, the prosecution suggested that Frey's contract killing was particularly terrible because it had been contemplated for a long time, because Frey had taken part in the planning by advising of his wife's route to work, because the manner of execution was particularly callous in that Frey had borrowed the money to finance the murder from his wife, and because Frey's motivation was simply greed.

The court then carefully instructed the jury. It stated that the verdict had to be death if the jury unanimously found at least one aggravating circumstance and no mitigating circumstance, or if it unanimously found that one or more aggravating circumstances outweighed any mitigating circumstances; otherwise, it instructed, the verdict had to be life imprisonment. The court noted that the only relevant aggravating circumstance was contract murder, but, unlike both counsel, gave a list of six possibly relevant mitigating circumstances: (1) the lack of a significant history of prior criminal convictions; (2) the influence of extreme mental or emotional disturbance; (3) substantial impairment of the capacity to appreciate criminality of conduct or to conform conduct to the law; (4) youth or advanced age; (5) extreme duress or substantial domination of another person; and (6) "any other mitigating matter concerning the character or record of the defendant or the circumstances of his offense." It also instructed that although the Commonwealth had to prove aggravating circumstances beyond a reasonable doubt, the defendant only had to prove mitigating circumstances by a preponderance of the evidence. Finally, it reminded the jury that its verdict had to be unanimous.

The jury retired to deliberate at 7:38 p.m. on May 14, 1980. After a little more than five and a half hours of deliberation, it returned its verdict at 1:18 a.m. the next day, unanimously voting for the death penalty. Post-trial motions were denied.

### C. Trials of the Coconspirators

Frey, Zehring, and Heberlig were originally scheduled to stand trial simultaneously, but before different judges and juries. Zehring's trial was postponed, however, and Heberlig, the triggerman, pleaded guilty to murder generally just as Frey

---

4. Frey's duress defense at trial appears to have evolved. Frey claimed during the guilt phase that he made payments to Zehring, instead of going to the police, to prevent Zehring from hurting the Frey family. On that view, Frey never wanted his wife murdered. At the penalty phase, however, Frey's desire to have his wife killed had been established. The defense at that stage seems to have been that, at worst, Frey had gone along with Zehring's plan, and that Zehring had threatened Frey both before and after the murder to prevent Frey from backing out and going to the police.

went to trial. The judge in Heberlig's case determined the offense to be first degree murder and, after Heberlig waived his right to a jury, sentenced him to life imprisonment. In so ruling, the court found that the three mitigating circumstances that it found present (no prior criminal record, good character, and the fact that Heberlig was not part of the original conspiracy to commit murder) outweighed the one statutory aggravating circumstance (contract murder).

In September 1980, Zehring pleaded guilty to murder, and, after a hearing, his trial judge also found him guilty of first degree murder. Zehring, like Heberlig, waived his right to a penalty phase jury, and, after a hearing, the trial judge sentenced him too to life imprisonment. At Zehring's sentencing hearing, the parties stipulated that Zehring had been taking prescribed amphetamines during the months leading up to the crime, that Zehring had only one minor prior offense (disorderly conduct), that Zehring was twenty-two years old at the time of the offense, and that Heberlig had received a life sentence while Frey had received a death sentence. There also was testimony of a psychologist that Zehring had schizoid and paranoid personality disorders.

In sparing Zehring's life, the trial court found that three mitigating circumstances (no significant history of prior convictions, presence of a personality disorder exacerbated by abuse of amphetamines, and cooperation with the authorities) outweighed the single mitigating circumstance (contract murder). The court's ruling did not mention Zehring's youth or the sentences of the coconspirators.

### D. *Post–Trial Proceedings*

Frey obtained new counsel on appeal. His initial direct appeal to the Pennsylvania Supreme Court raised numerous issues, none of which significantly troubled that court. See *Frey I*, 475 A.2d 700. The only issue raised there that concerns us here is his allegation that his sentence was excessive and disproportionate to the life sentences of Zehring and Heberlig. The Pennsylvania Supreme Court held that the other two cases were not "similar" for purposes of the proportionality review required by 42 Pa.Cons.Stat.Ann. § 9711(h)(3)(iii) (Purdon 1982). It considered the circumstances of Frey's participation dissimilar, and found significant differences in the "character and record" of the three, noting that Heberlig was a latecomer to the conspiracy and that Zehring was a drug-abusing paranoid schizophrenic. 475 A.2d at 708. While Heberlig's and Zehring's sentencing judges were therefore entitled to afford them mercy, that, according to the court, did not require that Frey too receive mercy. Id.

Frey then brought a petition under Pennsylvania's Post Conviction Hearing Act, 42 Pa.Cons.Stat.Ann. § 9543(3)(xiii) (Purdon 1982) (subsequently amended), alleging exculpatory after-discovered evidence, specifically 1984 statements by Zehring in prison that, according to Frey, showed that Frey had succumbed to Zehring's domination. The Court of Common Pleas denied the motion, and the Pennsylvania Supreme Court affirmed, concluding that Frey could have elicited any information that Zehring could have provided by calling him at trial, and that a different verdict was unlikely in any event. *Commonwealth v. Frey*, 512 Pa. 557, 517 A.2d 1265, 1268–70 (1986) ("*Frey II*"), cert. denied, 481 U.S. 1007, 107 S.Ct. 1633, 95 L.Ed.2d 206 (1987).

Frey again sought relief under the Pennsylvania Post Conviction Hearing Act, raising various theories, all of which were rejected by the Court of Common Pleas and, after a stay of execution, by the Pennsylvania Supreme Court. *Commonwealth v. Frey*, 520 Pa. 338, 554 A.2d 27 (1989) ("*Frey III*"), cert. denied, 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990). Among other things, the Pennsylvania Supreme Court rejected Frey's claim that Sorrentino had provided ineffective assistance of counsel. 554 A.2d at 32–33.

The court concluded that "counsel made a competent showing of such mitigating

evidence as was available, including the testimony of appellant and testimony of character witnesses," and classified the omitted evidence as "insignificant, irrelevant, or cumulative." Id. at 32. It concluded that the failure to mention Frey's memberships in the 4H and Lions Clubs could not conceivably have affected his sentence, and it noted that although defense counsel had not argued the 1977 death of Frey's son as a mitigating circumstance in the penalty phase, that fact was adduced in the guilt phase and had been incorporated into the penalty phase. Id. at 32–33. Evidence that the victim was having extramarital affairs would have been of little worth, the court further observed, because that would not only have been understandable in light of the couple's marital problems, but would also have undermined Frey's credibility, as he had stated that he was certain that his wife was *not* having affairs. Id. at 33.

Regarding Heberlig's sentence, the court also held that "[t]he sentence received by a co-conspirator is not a mitigating circumstance as to appellant's role in the crime," and it reiterated its earlier conclusion in *Frey II* that Zehring's testimony would not have affected the verdict. *Id.* Although the court conceded that Sorrentino had misstated the law regarding mitigating circumstances, it found no prejudice because Sorrentino had in fact argued a broad range of factors and the trial judge had set the jury straight that all could be considered. Id. It also rejected Frey's claims that voir dire was inadequate and that counsel had failed to object to inflammatory details about the murder and to explanations by the prosecution (after the defense had raised the issue) why Zehring and Heberlig were not called to testify. Id. Finally, the court dismissed Frey's claim that Bowers's testimony should not have been admitted, reasoning that the testimony tended to disprove a mitigating circumstance (coercion and influence by Zehring) that had been claimed by the defense throughout trial. Id. at 33–34.

Having thus exhausted his state court remedies, Frey petitioned for habeas corpus relief in federal district court under 28 U.S.C. § 2254 (1988). Following an extensive evidentiary hearing, the district court found that none of Frey's challenges to the guilt phase of his trial had merit, but, for reasons discussed more fully below, concluded that Frey received ineffective assistance of counsel at the penalty phase and was prejudiced thereby. It also concluded that the trial court erred by admitting Sharon Bowers's testimony. Accordingly, on March 28, 1991, the district court granted the writ of habeas corpus, vacating Frey's death sentence, without prejudice to the Commonwealth's right to resentence Frey to life imprisonment or to conduct further proceedings (including a new sentencing hearing) within 120 days.

The Commonwealth filed a timely appeal, over which we have jurisdiction under 28 U.S.C. § 1291 (1988). On July 10, 1991, we granted the Commonwealth's unopposed motion to stay the district court's mandate pending appeal to this court, the stay to expire on our disposition of the appeal. We now exercise plenary review over the district court's application of legal principles, including the district court's conclusions regarding ineffective assistance of counsel. See *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 291 (3d Cir.1991). No facts appear to be disputed at this stage.

## II. ADMISSION OF THE BOWERS TESTIMONY

■ The first issue is whether the state trial court committed constitutional error in admitting, at the very beginning of the penalty phase, the damning testimony of Sharon Bowers that, months before the murder, Frey had told her that he would kill his wife if he could get away with it. According to Frey, admission of that testimony at that stage was improper because it was not relevant to the single aggravating circumstance, contract murder, and Frey had yet to assert any claims of miti-

gating circumstances, hence it was premature for that purpose. Frey suggests that this error was highly prejudicial because it injected a nonstatutory aggravating circumstance into the case.

We note at the outset that, as a matter of Pennsylvania law, the Bowers testimony was admissible under 42 Pa.Cons.Stat.Ann. § 9711(a)(2).[5] Contrary to Frey's claim, nothing in the statute says that the Commonwealth's case-in-chief may only prove aggravating circumstances and that it must save for rebuttal its disproof of mitigating circumstances that the defense is obviously going to present and argue. Indeed, the Pennsylvania Supreme Court held in *Frey III* that the trial court properly admitted this testimony because it

> tended to disprove a mitigating circumstance claimed by the defense throughout trial, to wit, that appellant had been coerced and influenced by a co-conspirator. Clearly the testimony in question did show appellant's uncoerced desire, even months before the murder took place, to end the life of his wife.

554 A.2d at 34.

In terms of this court's purview, on matters of Pennsylvania law the Pennsylvania Supreme Court can do no wrong. We "examine the proceedings in the state court to determine if there has been a violation of federal constitutional standards.... [W]e do not exercise the supervisory power that we might possess on an appeal from a conviction in the district court." *Zettlemoyer*, 923 F.2d at 291 (citations omitted). The only issue, then, is whether the fact and timing of the admission of the Bowers testimony violated Frey's federal constitutional right to due process. We hold that they did not.

The admission of Bowers's testimony did not deprive Frey of a fair trial. As every-

one at the trial expected (based on Frey's trial defense), during the penalty phase Frey's counsel argued duress as a mitigating circumstance. Although the conversation with Bowers may or may not have taken place after Frey initially spoke with Zehring about murdering his wife (the record is unclear on that point), Bowers's testimony certainly tended to show that Frey desired to kill his wife even apart from threats from Zehring.

The district court concluded that the prejudicial effect of the evidence far outweighed its probative value. At a habeas corpus hearing, however, the federal court searches only for such a disparity between the two that admission amounted to the deprivation of a fair trial. See *Lesko v. Owens*, 881 F.2d 44, 50–52 (3d Cir.1989). Applying that standard, as we assume the district court did, we see no constitutional error. Bowers's testimony was highly probative and did not play on the passions of the jury. Although it was cumulative in the sense that it proved premeditation, which the jury had already found and which is not itself an aggravating factor under Pennsylvania law, it was evidence on the key question of Frey's independent desire (apart from Zehring's supposed influence) to kill his wife.

We also see no evidence of prosecutorial misconduct. The prosecution did not strategically reserve Bowers for the penalty phase. Bowers apparently did not testify earlier because the prosecution did not discover her until the close of its guilt phase case-in-chief. Had the prosecution saved Bowers for penalty phase rebuttal, no doubt Frey would now be complaining that the prosecution had "sandbagged" him. As it was, Bowers's testimony in the penalty phase case-in-chief gave Frey the opportunity to counter her testimony, which he

---

5. That subsection provides:
 (2) In the sentencing hearing, evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

attempted to do. Frey understandably did not want Bowers to testify at all, but her testimony was certainly admissible at some point in the sentencing hearing. We therefore conclude that the district court erred to the extent that its grant of habeas corpus relied on the supposedly erroneous admission of the Bowers testimony.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

#### A. *The Standard for Deciding Ineffective Assistance Claims*

Frey's stronger argument is based on the ineffective assistance of his trial counsel during the penalty phase.[6] Ineffective assistance claims are judged according to "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The same principles apply to capital sentencing proceedings. Id. Applying this standard requires use of a two-part test.

First, the petitioner must show that his or her counsel's performance was deficient—that, under all the circumstances, the attorney's representation fell below an objective standard of reasonableness. Id. at 687–88, 104 S.Ct. at 2064–65. Reviewing courts must be deferential in their scrutiny and scrupulously avoid the distortions of hindsight by viewing performance from counsel's perspective at that time. Id. at 689–90, 104 S.Ct. at 2065–66. Claimants must identify specific errors by counsel, and we must indulge a strong presumption that counsel's conduct was reasonable. Id. at 690, 104 S.Ct. at 2066.

Second, the petitioner must show prejudice. In certain limited circumstances, prejudice is presumed, but for most claims, including those raised here, a petitioner must demonstrate a reasonable probability

that, but for the unprofessional errors, the result would have been different. Id. at 691–96, 104 S.Ct. at 2066–69. The "reasonable probability" standard is less strict than the "more likely than not" standard, but it requires more than a showing of a theoretical possibility that the outcome was affected. Id. at 693–94, 104 S.Ct. at 2067–68. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068. In making this assessment of prejudice, we must ordinarily assume that the decision-maker would conscientiously apply the applicable legal standards, and we may not assume unusual propensities toward harshness or leniency. Id. at 694–95, 104 S.Ct. at 2068.

> When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.

Id. at 695, 104 S.Ct. at 2069.

We must, in this regard, consider the totality of the evidence before the trial court. Id. "[T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.... [We] should be concerned with whether, despite the strong presumption of reliability, the result ... is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Id. at 696, 104 S.Ct. at 2069.

#### B. *Counsel's Error: Gearing Evidence and Arguments Toward a Superseded Death Penalty Statute*

In this case, James Sorrentino's defense of Roderick Frey at the death penalty

---

**6.** Frey has not cross-appealed the district court's conclusion that he received effective assistance of counsel during the guilt phase.

phase was an undeniably powerful and emotional presentation by a skilled advocate. Based on a review of the trial transcript and his testimony before the district court, we have no doubt that he acted in good faith. The problem, however, is that Sorrentino, who was representing a client during a death penalty phase for the first time, was arguing based on a mistaken view of the applicable law. He inexplicably read to the jury from, and tailored his presentation to, a Pennsylvania death penalty statute that had been declared unconstitutional three years earlier in *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977), and rewritten in 1978.

Although we may not lightly second-guess attorneys' tactical decisions, this was no tactical decision. The Commonwealth does not dispute that this failure constituted substandard performance. The only dispute is over the probability that Sorrentino's basic error had a sufficient effect on the outcome to undermine our confidence in the result. Our primary focus is therefore on the differences between the statutes—whether the jury may have been confused and whether Sorrentino could have and should have made specific arguments under the new statute that, taken together, "reasonably probably" would have led the jury to spare Frey's life.

Ironically, the earlier statute had been held unconstitutional largely because it too severely limited the arguments on which the defense could rely as mitigating factors. *Moody*, 382 A.2d at 445–50.[7] The replacement statute that was actually in effect at the time of Frey's sentencing was in many (though not all) ways more lenient to defendants.[8] The following differences between the statutes are most significant here:

(1) Under the revised statute, lack of a prior criminal record is a listed mitigating

---

7. The earlier statute read, in relevant part:

> (d) Aggravating and mitigating circumstances.—If a murder of the first degree is accompanied by at least one of the following aggravating circumstances and none of the following mitigating circumstances, the person convicted shall be sentenced to death. If a murder of the first degree is not accompanied by any of the following aggravating circumstances or is accompanied by at least one of the following mitigating circumstances the person convicted shall be sentenced to life imprisonment:
>
> (1) Aggravating circumstances:
>
> . . . . .
>
> (ii) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.
>
> . . . . .
>
> (2) Mitigating circumstances:
> (i) The age, lack of maturity, or youth of the defendant at the time of the killing.
> (ii) The victim was a participant in or consented to the defendant's conduct as set forth in section 1311(d) of this title or was a participant in or consented to the killing.
> (iii) The defendant was under duress although not such duress as to constitute a defense to prosecution under section 309 of this title (relating to duress).

Reprinted in note accompanying 42 Pa.Cons. Stat.Ann. § 9711 (Purdon 1982).

8. The statute in effect at the time of Frey's crime and trial read, in relevant part:

> (c) Instructions to jury.—
> (1) Before the jury retires to consider the sentencing verdict, the court shall instruct the jury on the following matters:
>
> . . . . .
>
> (iv) the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance in subsection (d) and no mitigating circumstance or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstances. The verdict must be a sentence of life imprisonment in all other cases.
>
> . . . . .
>
> (d) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:
>
> . . . . .
>
> (2) The defendant paid or was paid by another person or had contracted to pay or be paid by another person or had conspired to pay or be paid by another person for the killing of the victim.
>
> . . . . .
>
> (e) Mitigating circumstances.—Mitigating circumstances shall include the following:
> (1) The defendant has no significant history of prior criminal convictions.

circumstance that the jury must consider. The earlier statute did not list this factor.

(2) Under the earlier statute, the defendant could prove as a mitigating factor that he or she acted under duress (although not such duress to constitute a statutory defense to the crime [9]), while under the revised statute the defendant may prove not only nonexculpatory "extreme duress," but also "substantial domination by another."

(3) Under the revised statute, the defendant may argue diminished capacity as a mitigating factor. The earlier statute did not specify diminished capacity as a mitigating factor.

(4) Under the revised statute, the defendant may introduce any other mitigating evidence concerning his or her character and record and the circumstances of the offense. The earlier statute contained no such provision.

(5) Under the earlier statute, presence of a single mitigating circumstance guaranteed that the defendant's life would be spared. Under the revised statute, aggravating and mitigating circumstances must be weighed, as long as at least one of each is found.

### 1. *Jury Confusion and Prejudice*

■■ Because Sorrentino mistakenly argued according to the wrong statute, he failed to tell the jury, among other things, that Frey's lack of a prior criminal record was a mitigating circumstance. He also incorrectly told the jury that if it found one mitigating circumstance, a life sentence was automatic; in fact, a jury may find that an aggravating circumstance outweighs any mitigating circumstances. We do not believe, however, that Sorrentino's misreading of the statute confused the jury as to the applicable law, because the prosecutor and, more importantly, the trial judge set the jury straight as to the proper statutory standards.

The prosecutor openly stated in a noninsulting fashion that he disagreed with Sorrentino's view of the applicable law, and proceeded to concede that Frey's lack of a prior record was a mitigating factor. The judge also read proper instructions on all the potentially applicable factors and how to weigh them,[10] and the jury was given a verdict form based upon a correct reading of the law. When the jury returned its death verdict, it indicated that it had found at least one mitigating circumstance, which

---

(2) The defendant was under the influence of extreme mental or emotional disturbance.
(3) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.
(4) The age of the defendant at the time of the crime.
(5) The defendant acted under extreme duress, although not under such duress as to constitute a defense to prosecution under Pa. C.S. § 309 (relating to duress), or acted under the substantial domination of another person.
(6) The victim was a participant in the defendant's homicidal conduct or consented to the homicidal acts.
(7) The defendant's participation in the homicidal act was relatively minor.
(8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense. 42 Pa.Cons.Stat.Ann. § 9711(c), (d), (e) (Purdon 1982) (subsequently amended in a manner not relevant here).

**9.** Pennsylvania's duress defense statute, 18 Pa. Cons.Stat.Ann. § 309 (Purdon 1983), which is

derived from section 2.09 of the Model Penal Code, reads:
(a) General rule.—It is a defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, which a person of reasonable firmness in his situation would have been unable to resist.
(b) Exception.—The defense provided by subsection (a) of this section is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress. The defense is also unavailable if he was negligent in placing himself in such a situation, whenever negligence suffices to establish culpability for the offense charged.

**10.** The only statutory factors on which the trial court did not instruct were consent or participation of the victim and minor participation in the crime, 42 Pa.Cons.Stat.Ann. § 9711(e)(7), (8). Obviously, Frey's wife did not voluntarily participate in her murder, and Frey's participation was not minor, especially given what the jury necessarily found at the guilt phase.

suggests that it understood the law properly.[11]

Frey nonetheless argues that Sorrentino's misstatements could have prejudiced him. Theoretically, the jury could have noticed that the judge and prosecution contradicted Sorrentino on the law and held it against Frey. But the record reveals no outspoken rebukes of Sorrentino, so it is most likely that the jury did not even notice. More importantly, even if the jury did notice, it apparently followed its proper instructions. At least we must presume so, absent any indication to the contrary.

2. *Inadequate Stress on Lack of a Prior Record*

As just noted, the prosecution and the trial judge both advised the jury that Frey had no prior record. On the other hand, defense counsel no doubt could have and,

in our view, should have presented that fact more persuasively. During the sentencing hearing, Sorrentino did elicit from Frey's father that Frey had never been in trouble before, but, presumably because Sorrentino did not know that criminal history was a statutory mitigating factor, he never hammered the point home in his closing argument. A grudging acknowledgment by the prosecutor and a dry instruction by the trial judge were hardly perfect substitutes.

Nevertheless, Frey's lack of a criminal record was definitely emphasized to the jury during the sentencing proceeding. We cannot conclude that a slightly more favorable spin on Frey's acknowledged lack of criminal history would have, by itself, made a significant difference in the jury's weighing of factors, especially given that the crime was particularly horrible.[12] Ac-

---

**11.** The sentencing verdict slip, which we have reproduced from *Frey III*, 554 A.2d at 31 n. 2, read:

**SENTENCING VERDICT**

AND NOW, *May 15* , 1980, we the jurors empaneled
(insert date)

in the above captioned case unanimously sentence the defendant to

*DEATH*

(insert either death or life imprisonment)

If the sentence is death complete the following portion.

(check only one block)

We the jury have found unanimously

☐ At least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) (is) (are)

_____

_____

☒ One or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s) (is) (are)

*Murder by Contract*

_____

[ JURORS' SIGNATURES ]

**12.** Because the prejudice question under *Strickland* is whether all of counsel's unprofessional errors *combined* undermine our confidence in the result, we delay consideration of that ultimate issue until we have assayed all the arguments that Sorrentino should have made but did

cordingly, our main consideration will be other potentially mitigating factors pressed by Frey on this appeal that neither the defense nor the prosecution argued *in terms* during the sentencing phase. We take those arguments in statutory order.

### 3. *Failure to Argue Extreme Emotional Disturbance and Diminished Capacity*

■ The revised statute lists as mitigating factors "influence of extreme mental or emotional disturbance," 42 Pa.Cons.Stat. Ann. § 9711(e)(2), and "substantial[ ] impair[ment]" of the defendant's "capacity ... to appreciate the criminality of his conduct or to conform his conduct to the requirements of law," 42 Pa.Cons.Stat.Ann. § 9711(e)(3). Although the trial judge instructed on both of these, and defense counsel could certainly have argued both, we conclude that there was virtually no chance that the jury would have found either one.

The psychological evidence from the expert, Dr. Wittmaier, simply did not support a finding of either extreme emotional disturbance or diminished capacity. Wittmaier concluded that Frey "ha[d] a good understanding of social conventions, [and] that his judgment would be generally adequate." Tr. 1034. Frey's only significant deviations from a normal psychological profile were harm avoidance, defendence, and exhibition, none of which were at all likely to convince a jury that Frey was emotionally disturbed or suffered from diminished capacity in a premeditated contract murder case. Hence even if Sorrentino should have argued either of these factors, Frey incurred insignificant prejudice from the failure to argue them.

### 4. *Failure to Argue "Substantial Domination"*

The revised statute considers both "extreme duress, although not ... such duress as to constitute a defense to prosecution" and "substantial domination by another person" as a mitigating circumstance. 42 Pa.Cons.Stat.Ann. § 9711(e)(5). The drafters of this statute obviously considered this lesser species of duress and "substantial domination" to be qualitatively similar, for they listed the two together as one mitigating factor. Moreover, although the Commonwealth conceded at oral argument, and we shall assume, that "substantial domination" is a somewhat less rigorous standard than this brand of duress, the difference between the two does not appear great, at least on the facts of Frey's case.[13]

■ When a defendant is in the penalty phase, the jury has already ruled out true duress of the kind that is a defense to guilt under 18 Pa.Cons.Stat.Ann. § 309 (quoted in note 9). The only sorts of duress remaining during the penalty phase of a capital case are therefore situations where (1) a "reasonably firm" person would have resisted actual or threatened use of force but the defendant did not (subsection 309(a)), or (2) the defendant has recklessly placed himself or herself in a situation where coercion by actual or threatened use of force is probable (subsection 309(b)). Frey's argument was of the first sort: Sorrentino argued, and Frey still maintains, that he was a weak person who gave in to Zehring's threats.

■ "Substantial domination," in contrast, might not require the actual or threatened *force* that is an element of duress. A dominant coconspirator may have a magnetic, persuasive personality and the defendant may simply be psychologically easy to manipulate, such that threatened

---

not make. We will, however, analyze the strength of Frey's case on each potentially mitigating factor as it would have been argued by competent counsel aware of the correct statute (not by the nation's finest defense lawyers). Then we will aggregate the defense's arguments on all the potentially mitigating factors and compare them to the prosecution's very strong case on the single aggravating factor of contract murder. Finally,

we will assess whether it is reasonably likely that, if Frey had had proper assistance of counsel, the jury would have returned a verdict of life imprisonment.

**13.** We have not discovered any Pennsylvania case discussing the difference between "substantial domination" and mitigating but nonexculpatory "extreme duress."

force is unnecessary. Nevertheless, on these facts both defenses were similar in that the basic premise of both would have been that the dominant coconspirator, Zehring, led a weak Frey astray.

■ Because the arguments were so similar and were linked in the statute, reasonable defense counsel might have spoken of "duress" as a shorthand while making both arguments. But that is apparently not what happened here. Sorrentino vigorously argued duress, but, because he was using the incorrect statute, did not know that he could argue "substantial domination" to the jury. Sorrentino's mistake was not a verbal miscue, and we can imagine no tactical reason to argue duress but not "substantial domination," which the Commonwealth has conceded is slightly easier to prove. We will therefore assume that Sorrentino's failure to mention "substantial domination" was deficient performance for purposes of the first prong of *Strickland*.[14]

For purposes of the second, prejudice prong of *Strickland*, however, we must consider the likely strength of the "substantial domination" argument, had it been presented by counsel who knew to make the argument. In determining whether a competent argument would have swayed the jury, we must bear in mind that the jury heard a more than competent and very

similar argument on "duress" and still returned a death verdict.

We believe that there was sufficient evidence for the jury to find "substantial domination" (and mitigating but not exculpatory duress, for that matter). Frey testified during the guilt phase that Zehring had continuously threatened him and his family and that he paid Zehring several times *not* to harm them. Frey said that he did not go to the police because Zehring had specifically threatened harm if he did so. He particularly described one incident where a raging Zehring, who at over six feet and about two hundred pounds was apparently much larger than Frey, had shone a flashlight in his face, brandished a gun, and threatened to kill him. The guilty verdict suggests, however, that the jury found much of Frey's trial testimony incredible.

Of course, the jury did not necessarily disbelieve Frey's version of events completely. Indeed, the prosecution primarily relied upon, and the jury most likely believed, Frey's earlier statements to the police. In one portion of his taped confession, which was played for the jury during the guilt phase, Frey stated that he decided to do what *Zehring* had suggested that he do—"waste" his wife. Tr. 697. In another portion of the statement, set out in the margin, Frey stated that he feared Zehring and that Zehring had threatened to kill him if he spoke to the police.[15]

---

**14.** Frey also contends that Sorrentino's lawyering was deficient for not calling Zehring to the stand. In 1984, years after the trial, and in 1990 at the federal habeas hearing, Zehring testified in a sworn statement that he was the moving force behind the plot, and that he manipulated Frey as a puppeteer would a puppet.

While it is certainly possible that, at Frey's trial, Zehring could have supported Frey's claims of substantial domination and duress, that was highly uncertain. Zehring's testimony came much later, at a time when he was assured of a life sentence, while at the time of Frey's trial, Zehring had yet to plead guilty. Sorrentino testified before the district court that Zehring's story has changed since the time of Frey's trial. Moreover, by all accounts, including the accounts of Zehring's fellow inmates who testified at Frey's trial, Zehring is a bizarre person. His credibility was and is questionable, especially as he admits that his current recollection of the events of 1979 is hazy due to his abuse of amphetamines.

Given the deference that we must accord trial counsel's strategic choices, we conclude that it was not substandard performance for Sorrenti-

no to have concluded at that time that there was no way of knowing what Zehring would say, that Zehring's testimony on cross-examination might well hurt Frey's case, and hence that calling Zehring was too risky. For purposes of judging ineffective assistance, then, we place no weight on Zehring's subsequent statements.

**15.** Q. Did you meet with [Zehring] on the evening of the 7th [of November, the day before the crime]?
A. Yeah. He came to my residence.
Q. Do you recall what time that was?
A. Around eleven o'clock.
Q. Did Mr. Zehring threaten you in any way?
A. Yes.
Q. How was that?
A. He told me that if I would even talk to the police about this, I would get the same thing my wife got.
Q. What is your understanding of that?
A. That I'll be shot, too.
Q. Did he tell you how or who this would be done by—you would be shot, too?
A. Yes.

Other evidence was adduced that Zehring was a scary, domineering person, while Frey was susceptible to domination. As to Zehring, several witnesses testified that Zehring was a strange man who had a fetish for weapons and often made threats. The jury could also have credited (at least partially) the testimony of Zehring's fellow inmates that Zehring was crazed and had boasted in jail that he was extorting money from Frey and intended to kill him. As to Frey, the expert witness Wittmaier had testified that Frey was of low-average intelligence, tended to be submissive, that he did not defend himself well, and that he expressed himself poorly. The jury could have concluded from Wittmaier's opinion testimony that Frey, although not particularly psychologically abnormal and therefore responsible for his own actions, was likely to go along with the suggestions of others, such as Zehring. In short, there was considerable evidence that although Frey was a voluntary participant, Zehring was the dominating force in the conspiracy.

On the other hand, there was also strong evidence against a finding of "substantial domination" (and mitigating duress). Most powerful was the testimony of Bowers that, months before the murder, Frey had expressed an independent inclination to kill his wife. Moreover, Frey had arranged the murder of his wife of over twenty years, and the discussions of her murder transpired over a long period. The jury could easily have concluded that even a submissive man does not easily arrange the murder of his wife simply because an acquaintance suggests it. And while it is possible that "substantial domination" can endure for months, given Frey's mature age and only slightly abnormal psychological profile, the jury may have found that most unlikely, particularly since his wife (and the mother of his children) was the victim.

Furthermore, as the Commonwealth observes, the evidence of "substantial domination" was argued, although not as such. Both sides incorporated all the evidence from the guilt phase into the immediately following penalty phase, and Sorrentino argued much of the evidence of "substantial domination," albeit in urging a finding of "duress."[16] Although neither party men-

---

Q. What did he say?
A. He told me that the second party that was involved in this with him knows what I look like, they know where I work, they can get to me any time.
Q. Do you believe this to be true?
A. Yes.

. . . . .

Q. Do you have a fear of Mr. Charles Zehring?
A. Yes.
Q. And would you explain to me why you fear Mr. Zehring?
A. Because he might have me killed now.
Tr. 717–18.

It is not clear whether the conversation recalled in this excerpt took place before or after the murder. The murder took place early in the morning of November 8, 1979, and Frey was recalling a conversation of the evening of November 7. On the other hand, in his statement Frey repeatedly insisted that he did not know beforehand that his wife would be shot, and, on this theory, if he feared being shot, then the conversation with Zehring must have taken place after the murder.

**16.** The following is an excerpt from Sorrentino's closing:

Mr. Zehring is not a nice guy. Mr. Zehring through the Commonwealth's own witnesses and through the witnesses we produced was proved to you to be a man who always had guns, always had weapons, armed bombs, had books on anarchy, et cetera, made threats, people consider him a little crazy ...

Did Mr. Zehring coerce Mr. Frey in any way? Is this the situation where there was a sequence of events? You heard about the hiring and following of Mrs. Frey for two months. Was Mr. Frey suckered? Was Mr. Frey convinced maybe this was a good idea? Did it go along that kind of scenario? Is that what happened here?

I can't believe ... that Mr. Frey just suddenly decided to have his wife killed and went to Mr. Zehring and said here is some money, kill my wife. I don't believe that at all. I think there was duress in this case. I think when Mr. Frey tells you that he was threatened, he was threatened. Whether he was threatened before or after he paid the money or for what purpose he paid it, he was threatened. He was threatened before Mrs. Frey was killed. When he tells you that one morning in the Turkey Hill parking lot Mr. Zehring appeared with black all over his face and a sweatshirt and held a gun and a flashlight in his eyes, that is a threat. That is coercion. That is duress. It was verified by the Lancaster County prisoner[s].

. . . . .

The psychologist told you about Mr. Frey and what kind of man he is. He has a 91 I.Q.

tioned "substantial domination" in its summation, the trial judge did in his jury instructions, and we must assume that the jury considered the evidence in light of its instructions. No doubt Frey's representation would have been stronger had Sorrentino recounted the evidence of "substantial domination" as such and dovetailed it into the statute. But his error was essentially one of mislabeling arguments that supported *both* "substantial domination" and mitigating duress, factors listed together in the statute, as supporting only the latter.[17]

Frey's theory of prejudice appears to be that the jury actually found neither "substantial domination" nor mitigating duress, but, with proper argumentation, it would have found "substantial domination."[18] To make that fine distinction, the jury would have to have disbelieved that Zehring threatened force against Frey and his family, but still believed that Zehring exploited Frey's psychological susceptibility to domination. Such an interpretation was certainly possible, but unlikely. Moreover, we find it even less likely that, if the jury

so found, it failed to credit Frey's psychological weaknesses either under the rubric of "substantial domination" or as part of its consideration of the character of the defendant and the circumstances of the case. Therefore, even if Frey is correct in how the jury interpreted the evidence, we highly doubt that Sorrentino's labeling error had any significant effect on the jury's decision.[19]

### 5. *Failure to Argue Heberlig's Life Sentence*

Frey also strongly urges that Sorrentino was deficient in failing to advise the jury that the triggerman, Heberlig, had received a life sentence just the week before. Frey contends that such evidence was admissible under the miscellaneous mitigating circumstances provision in the Pennsylvania statute, 42 Pa.Cons.Stat.Ann. § 9711(e)(8), or as a matter of federal constitutional law. He also suggests that he was significantly prejudiced by that failure because Heberlig's life sentence was later argued to Zehring's sentencing judge, who sentenced

He is not a super intelligent person. He is not someone who, I don't think, could coldly and calculatingly do this kind of thing without some kind of pressure from another source. I suggest to you again the pressure was from Mr. Zehring and that this thing took a sequence of events. It wasn't as if Mr. Frey went over to Mr. Zehring and said here is $5,000, kill my wife. That is not what happened. The payments were spora[d]ic payments and the Commonwealth cannot refute that. This thing took a course of action, it went along, and it got more serious, more aggravating, as it went along.

But there was duress. And that is all that is required in this proceeding. If you believe that Mr. Zehring coerced, threatened, placed Mr. Frey under duress prior to the death of Barbara Jean Frey, that is enough. He is entitled to be in prison for the rest of his life. But he doesn't deserve the death penalty.
Tr. 1377–80.

17. This conclusion is not surprising because, as noted above, on these facts the two defenses were very similar. We have observed that the only relevant difference may be that mitigating duress requires an element of force, whereas force may be unnecessary for a "substantial domination" claim.

18. We know only that the jury found at least one mitigating circumstance. We do not know which mitigating circumstances the jury found.

The box that the jury checked on the verdict form required it only to list the aggravating circumstances, not the mitigating circumstances. See note 11. If the jury actually found mitigating duress or "substantial domination," Frey would have suffered no prejudice from the failure to argue "substantial domination."

19. Frey argues that the reference to "duress" was harmful because the jury had rejected duress as a defense to the conviction. But Sorrentino properly spoke of "duress"—even the correct statute uses the term. We believe that the jury properly understood that the issue was being resubmitted to the jury for a different purpose and with a slightly different standard—as a factor, among many, to help determine the appropriate penalty, rather than as an absolute defense to guilt. Moreover, as we observed in note 4, the duress defense during the sentencing phase was somewhat different as a factual matter from the duress defense during the guilt phase.

In our view, the only danger in speaking solely of "duress" was that the jury might have equated "substantial domination" and "duress." But as we noted in the text, the difference between the two was not great, and even if the jury failed to focus on "substantial domination," it was entitled to consider Frey's psychological weaknesses as a mitigating personal characteristic.

Zehring to life imprisonment.[20] Blending its arguments on the two prongs of *Strickland,* the Commonwealth suggests that Heberlig's sentence was irrelevant and inadmissible, and that even if it had been admissible, arguing Heberlig's sentence may have backfired on Frey.

The parties spend much of their briefs disputing whether Heberlig's sentence would be admissible as a matter of present law. As a matter of Pennsylvania law

today, codefendants' sentences may be excluded.[21] It remains less clear whether the federal constitution (specifically the Fifth, Eighth, and Fourteenth Amendments) requires that codefendants' sentences must be admitted as mitigating evidence in a death penalty hearing.[22] We do not need to address that issue here, however.

■ We deal not with an attack on a trial court's refusal to admit such evidence, but with a claim of ineffective assistance of

---

**20.** Because Zehring was sentenced to life imprisonment long after Frey's trial, Sorrentino obviously could not have raised Zehring's sentence. Zehring's sentence may have been relevant in the post-trial proportionality review required by Pennsylvania law, but the district court did not reach Frey's claim regarding the proportionality review, and it is not before us. Zehring's sentence concerns us here only because Frey argues that Heberlig's sentence made a difference in Zehring's sentencing, and so could also have made a difference in Frey's case.

**21.** The Pennsylvania Supreme Court held in Frey's own case that

[s]entencing is a highly individualized matter, and we have already ruled that the cases against appellant's co-conspirators are not similar to appellant's case for purposes of proportionality review. [*Frey I*], 504 Pa. at 444–45, 475 A.2d at 708. The sentence received by a co-conspirator is not a mitigating circumstance as to appellant's role in the crime.

*Frey III,* 554 A.2d at 33. See also *Commonwealth v. Haag,* 522 Pa. 388, 562 A.2d 289, 298 (1989) (approving trial court's ruling that jury would not be apprised of acquittal of one codefendant and life sentence of another).

**22.** In *Lockett v. Ohio,* a plurality of the Supreme Court took the view that the Constitution requires that the sentencer in a capital case be permitted to consider "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of death." 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973 (1978). That view became the majority view in *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982). The Court has reaffirmed that holding numerous times since then, notwithstanding criticism, most vociferously from Justice Scalia, see *Walton v. Arizona,* 497 U.S. 639, 649–58, 110 S.Ct. 3047, 3058–68, 111 L.Ed.2d 511 (1990) (Scalia concurring). The Court has also broadly defined what is relevant to character, record, and circumstances of the crime. As long as any reasonable juror might use evidence in support of a life verdict, the court must admit it.

*McKoy v. North Carolina,* 494 U.S. 433, 436–438, 110 S.Ct. 1227, 1231–34, 108 L.Ed.2d 369 (1990).

On the other hand, the Court has never ruled directly upon the relevance of codefendants' sentences. In *Parker v. Dugger,* —— U.S. ——, 111 S.Ct. 731, 112 L.Ed.2d 812 (1991), Justice O'Connor's majority opinion noted in passing that, pursuant to both Florida and federal law requiring consideration of all mitigating evidence, the Florida trial court had admitted evidence that none of Parker's accomplices had received a death sentence. *Id.* at ——, 111 S.Ct. at 736. The Court's holding, however, did not turn on that point. The Court has held that state appellate courts need not compare a defendant's sentence to those of others convicted of similar crimes, *Pulley v. Harris,* 465 U.S. 37, 43, 104 S.Ct. 871, 875–76, 79 L.Ed.2d 29 (1984), but the issue there was not admissibility of evidence before a sentencing jury and did not focus on coconspirators' sentences in particular.

The state and lower federal courts have split. One line of cases considers codefendants' life sentences relevant, albeit with little discussion why. See, for example, *Brookings v. State,* 495 So.2d 135, 142–43 (Fla.1986) (jury may compare sentences of those culpable of same crime, but not sentences of those guilty of lesser crimes); *People v. Gleckler,* 82 Ill.2d 145, 44 Ill.Dec. 483, 492–95, 411 N.E.2d 849, 858–61 (1980) (vacating death sentence partly based on life sentence given to accomplice); *State v. McIlvoy,* 629 S.W.2d 333, 341–42 (Mo.1982) (death sentence disproportionate to crime where defendant was weakling and follower of another defendant who had received life sentence).

Another line of cases holds that accomplices' sentences may be excluded because not material to the defendant's character or record or to the circumstances of the defendant's crime, and because the same logic might require admission of coconspirators' death sentences. See, for example, *Brogdon v. Blackburn,* 790 F.2d 1164, 1169 (5th Cir.1986); *People v. Dyer,* 45 Cal.3d 26, 69–71, 246 Cal.Rptr. 209, 234–36, 753 P.2d 1, 26–27 (1988); *State v. Williams,* 305 N.C. 656, 686–87, 292 S.E.2d 243, 261–62 (1982); *Brogie v. State,* 695 P.2d 538, 546–47 (Okla.1985); *Johnson v. State,* 477 So.2d 196, 218 (Miss.1985), rev'd on other grounds, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

counsel for failure to *attempt* to introduce such evidence. Under *Strickland*, the initial questions here are thus whether any competent defense counsel would have attempted to argue Heberlig's sentence *in 1980*, and if so, whether prejudice was "reasonably probable"—whether the evidence would have been admitted then and whether the jury would likely have been significantly impressed by that argument. Only if the answers were yes would we need to decide what the law is today.[23]

In 1980, the law was, as it is now, unclear whether a coconspirator's sentence was admissible. We will assume that competent defense counsel would not have refrained from offering such evidence based solely on doubts about admissibility. Such doubts might have played a role, however, in counsel's decision. More to the point, competent defense counsel in Frey's case would also have considered whether introducing Heberlig's life sentence would help Frey, and in this case that was debatable.

Heberlig was the triggerman, but in many other ways he was less culpable than Frey. Heberlig was a latecomer to the conspiracy who panicked and shot the victim when events did not go as planned. In contrast, the jury might have concluded that Frey was a cold-blooded conspirator involved from the beginning. On that view, if Heberlig deserved life imprisonment, the jury might have concluded that Frey deserved much worse. We conclude that reasonable counsel could well have differed about whether mention of Heberlig's sentence would have helped Frey.

At all events, because Heberlig's actions were not very similar to Frey's, we conclude that the argument, even if it had been attempted, and even if it had been allowed by the trial judge (which is questionable[24]), would not have swayed the

jury much if at all. Moreover, although Frey correctly notes that the Heberlig and Frey sentences were introduced at the Zehring sentencing hearing by way of stipulation, there is no evidence that Zehring's sentencing judge took that factor into account. Far more important in Zehring's case were his disturbed mental state and his cooperation with authorities. We therefore do not consider Heberlig's sentence to be a significant mitigating factor that could help sustain the district court's conclusion of prejudicial ineffective assistance of counsel.

### 6. *Failure to Argue Other Miscellaneous Mitigating Circumstances*

■ Finally, Frey contends that Sorrentino should have focused the jury's attention on a variety of other possible miscellaneous mitigating circumstances related to Frey's personal background. These factors, which were adverted to during the guilt phase, include the tragic story of the 1977 death of Frey's son in an automobile accident, his ensuing impotence, and the partially related deterioration of his marriage; his somewhat low IQ and psychological weaknesses; and his good work record. All of this was undoubtedly admissible during the penalty phase as "other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.Cons.Stat. Ann. § 9711(e)(8).

Although Sorrentino mentioned some (though not all) of these factors in his closing argument during the penalty phase, he also told the jury that the only pertinent mitigating circumstances were age and duress. Instead of arguing these factors as independent mitigating circumstances, he attempted to shoehorn them into proof of duress (a finding of which he incorrectly

**23.** It would make no sense to require resentencing on this basis if the trial court on resentencing could, based on the law today, properly exclude the evidence of coconspirators' sentences.

**24.** Introduction of Heberlig's sentence may have required considerable additional testimony regarding Heberlig's role. The jury may not have known the details of Heberlig's role in the of-

fense: the parties barely mentioned Heberlig, referring to him only as "Mr. X" and instead focusing on the roles of Zehring and Frey. Thus, even if the trial judge had not anticipated the Pennsylvania Supreme Court's later holdings and considered Heberlig's sentence legally relevant, he may have desired to exclude it on the ground that it would distract the jury.

believed would automatically save Frey's life).[25] While failure to focus upon every single detail as a separate mitigating factor would not have constituted substandard performance, under the circumstances of this case, we will assume that Sorrentino's failure to argue *any* "miscellaneous" mitigating circumstance as such was deficient performance.

As with the lack of a prior criminal record, however, the jury was reminded of most of this information during the sentencing phase, and the trial judge properly instructed the jury that this sort of information should weigh in the balance of aggravating and mitigating factors. More precise argumentation may have helped Frey somewhat, but standing alone this would be an insufficient showing of prejudice. This "miscellaneous" factor does not stand alone, however, so we turn to consideration of *all* the ineffectively argued mitigating circumstances, as weighed against the aggravating factor of contract murder. See note 12.

### C. *Weighing the Aggravating and Mitigating Factors*

■ In Pennsylvania, if a penalty phase jury finds at least one aggravating and one mitigating circumstance (as it did in Frey's case), it may only impose the death penalty if it unanimously finds that the aggravating circumstances outweigh the mitigating circumstances. 42 Pa.Cons.Stat.Ann. § 9711(c)(1). If the jury is deadlocked, the sentence must be life imprisonment. Id. For Frey to show sufficient prejudice, then, he must show a "reasonable probability" that, if he had had effective assistance, at least one juror would have decided differently and held out for a verdict of life imprisonment.

A reasonable juror would have had to find that Frey had no significant prior criminal history, for the Commonwealth conceded that. We have also concluded above that a reasonable juror could have, although could easily not have, found that Zehring "substantially dominated" Frey. A reasonable juror might also have considered various of Frey's personal circumstances (such as his psychological/intellectual profile, past family traumas, and so forth) as mitigating circumstances. But, in light of the guilt phase verdict (which is not challenged here), the jury also had to conclude that the aggravating circumstance of contract murder was proven beyond a reasonable doubt. Frey does not and could not contend that effective defense counsel would have prevented the jury from finding the single alleged aggravating circumstance of contract murder, as the evidence of that fact was overwhelming.

Frey instead contends that the jury could easily have found at least three mitigating circumstances (even lumping all the miscellaneous factors into one), and thus that it is "reasonably probable" that the jury would simply have concluded that three is more than one and sentenced Frey to life imprisonment. Perhaps so, but we cannot accept that argument. *Strickland* instructs that in assessing what would have transpired we must presume that the jury would act according to proper legal instructions. 466 U.S. at 694–95, 104 S.Ct. at 2068. The statute requires a weighing of factors, not

---

25. The relevant portion of the closing argument was as follows:

> Let's talk about Mr. Frey.
> When we talk about duress, you have to consider the person you are judging first. I am not going to belabor it. You have heard it.
> Mr. Frey is forty-three years old. He has no prior record. He has children. He has a family. You have seen some of them on the stand. He has worked consistently through his entire life.
> His intelligence, his background, his demeanor, his personality, is not consistent with this crime. And I suggest to you that even if

> you believe that he was involved in this crime, and obviously you do or you wouldn't have convicted him, there had to be duress and there had to be duress in view of the other testimony you heard in the case.

Tr. 1376–77. Sorrentino then launched into an extended discussion of Zehring's coercion of Frey and of Frey's susceptibility thereto. That portion of the summation is quoted in note 16. At no point in his summation did Sorrentino mention the death of Frey's son in an automobile accident, although mention of that fact may have been unlikely to elicit sympathy, given that Frey chose to have his wife killed in a staged automobile accident.

a subtraction exercise in a factual vacuum. We must therefore consider not only possible mitigating factors, as we have done above, but also the aggravating factor. In particular, we must consider, as the jury did, not simply the fact of contract murder, but its nature.

As the first degree murder verdict attests, this was a "willful, deliberate and premeditated killing." 18 Pa.Cons.Stat. Ann. § 2502(a), (d) (Purdon 1983). The discussions and planning took place over several months, and Frey was involved during the entire time. Bowers's testimony suggested that Frey quite voluntarily contracted for his wife's murder. The jury surely could not have ignored that Frey callously borrowed the money to pay for his wife's murder from his wife herself. And it must have recalled that Frey's motive for killing his wife was, by his own admission, purely financial, and that he showed little visible remorse despite the brutal way in which the murder transpired. In short, this was not a murder contracted in a fit of provoked anger, but a calculated business-like deal.

With these facts in mind, we simply cannot conclude that there is any "reasonable probability" that, with effective assistance of counsel, Frey's jury would have found that the balance of mitigating and aggravating factors tipped the other way. Sorrentino's misstatements about the statute were corrected. All the evidence was before the jury, which was properly instructed. The jury was reminded of Frey's lack of a criminal record and of his psychological/intellectual profile, and although Sorrentino did not argue "substantial domination" as such, he did argue essentially the same facts in support of the cognate theory of mitigating duress. After five and a half hours of deliberation (about the same amount of time that it took to determine guilt, and not a long period for a capital case), the jury concluded that the mitigating factors paled in comparison to the horrible nature of the contract killing.

Reviewing the record twelve years later, and aided by excellent advocacy by counsel for both sides, we see only a very remote possibility that that jury would have weighed the facts differently had Sorrentino argued the same facts to prove slightly different legal points. We recognize that our legal system depends critically upon defense counsel's effective advocacy, and in some cases, especially close cases, substandard marshaling of the evidence by defense counsel will be sufficiently prejudicial to warrant retrial. In our view, however, Sorrentino did a quite capable job of arguing the facts in Frey's favor, and this was not a case in which better labeling of legal arguments could reasonably likely have tipped the lay jury's balance away from a death verdict. Put another way, in the context of the entire case, Sorrentino's shortcomings, though highly unfortunate, have not "undermined [our] confidence in the outcome," *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068.

## IV. CONCLUSION

The order of the district court granting the writ of habeas corpus to petitioner-appellee Roderick Frey will be vacated. The case is remanded to the district court for further consideration of issues raised in Frey's petition but not reached by that court.

COWEN, Circuit Judge, dissenting.

Because I believe that Roderick Frey has demonstrated a "reasonable probability" that but for the unprofessional conduct of counsel, the result of the penalty phase would have been different, I would affirm the district court's order granting the writ of habeas corpus. Therefore, I respectfully dissent.

As the majority concedes, defense counsel's reading from and reliance on a death penalty statute which had been declared unconstitutional three years earlier constitutes substandard performance and thereby satisfies the first prong of the test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The sole issue in this case is whether this error resulted in "prejudice" sufficient to satisfy the second prong of the *Strickland* test. It should be stressed at the outset that the Court in *Strickland*

rejected an "outcome-determinative standard" under which a petitioner would have to prove by a preponderance of the evidence that the result would have been different had the petitioner been provided reasonably effective representation. *Id.* at 693, 104 S.Ct. at 2067. Instead, the *Strickland* Court defined a "reasonable probability" of a different outcome as "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. The majority fails to accept the most obvious fact of this case: that had Frey been represented by even moderately competent counsel, a legitimate and compelling argument would have been advanced on the penalty phase why life imprisonment was appropriate. The jury never heard an effective or legally correct argument from the attorney for Frey (Frey's "champion") why Frey should not suffer death. The Court in *Strickland* also cautioned that "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.* at 696, 104 S.Ct. at 2069. Unlike the majority, I cannot accept as fair a jury verdict of death when the defendant was represented by an attorney who labored under a long amended law, and where the law presently available afforded numerous and cogent arguments which could have been advanced in favor of a sentence of life imprisonment instead of death.

The majority concludes that no reasonable probability of a life sentence existed, finding that the jury was not "confused" by counsel's error and the jury would in all likelihood have reached the conclusion it did even if counsel had based his penalty phase presentation on the correct statute. I disagree with both of these premises.

As an initial matter I note the obvious: a jury expects defense counsel in a capital murder case to at least be familiar with the correct and applicable death penalty statute. While it is true that the prosecutor knew the correct law and the court at the conclusion of summations instructed the jury on the correct statute, such knowledge by the prosecutor and instructions by the trial court cannot be presumed to have cured any confusion which unquestionably arose, as the majority seems to suggest.

Instead, the conflicting instructions could only have added to the jury's confusion. And of commanding significance, which the majority does not appreciate or fails to grasp, a jury looks to defense counsel (not the prosecutor or the judge) for an argument and reasoning why the defendant should not suffer death. The jury does not listen to the prosecutor for an analysis of the evidence which is cast in a light most favorable to the defendant. Nor does the jury listen to the charge of the court for reasoning which would justify a sentence of life. The jury receives the court's charge as a neutral and objective statement of the law—not an argument for the defendant. Certainly, no jury is "tuned in" to why the defendant should be spared when the prosecutor is delivering his summation. It is obvious that the jury received no such message from the prosecutor in this case.

I do not agree with the majority's conclusion that no "prejudice" exists to satisfy the second prong of *Strickland.* I believe there is a "reasonable probability" that the outcome would have been different had counsel fashioned his penalty phase presentation in accordance with the correct statute. At the least, I do not have confidence in the death verdict which the majority has rationalized into a fair verdict.

As a general matter, such a gross error on the part of defense counsel may well have served to undermine the jury's confidence in the arguments which were made on Frey's behalf. It is difficult to imagine that such an error would not have at least some adverse impact on the jury's perception of defendant's counsel and Frey himself.

More specifically, I am deeply troubled by the simple fact that Frey's "advocate" did not advocate on his behalf. As the majority acknowledges, as it must, the prejudice question under *Strickland* is whether all of counsel's unprofessional errors, *taken as a whole,* undermine our confidence in the result. Had counsel here simply failed to mention one applicable mitigating factor, my confidence might not be so drastically undermined. But the error was not near so minor. While Frey thought he had an attorney "representing" him during the penalty phase, the net effect was no

different than not being represented at all. I say this since it is the major inarticulated premise of the majority that it does not matter that Frey was not represented (or incompetently represented), since the prosecutor and judge effectively represented him.

Counsel for Frey geared his entire presentation around the erroneous premise that if one mitigating circumstance was found, a life sentence was automatic. The majority may be correct when it suggests that none of the mitigating factors, standing alone, was sufficient to outweigh the single aggravating factor. The problem with the majority's analysis, however, is that its focus is on each separate possible mitigating factor, how that factor might have been argued had counsel known it was available, and whether that particular factor would have been found to outweigh the one single aggravating factor. The majority spends just three pages discussing the impact that all of these numerous mitigating factors, taken together, might have had. The majority appears ready to concede (but it fails to do so) that had the proper statute been used by defense counsel the jury might well have concluded that three or more mitigating factors were present. However, the majority inexplicably surmises that "the jury concluded that the mitigating factors paled in comparison to the horrible nature of the contract killing." Maj.Op. at 369.

The majority's analysis cuts both ways. Its own argument as to the nature of the crime points up how critically important it was in this case for counsel to present the applicable mitigating factors as a whole and to argue that when added together and carefully balanced against the single aggravating factor, death was not the appro-

priate penalty. The problem, in short, was that while the jury may have been "told" by the prosecution and the court that other mitigating factors existed under the statute, no one ever attempted to *persuade* them that the sum total of those factors outweighed the one aggravating factor. As wisely noted by the district court, "the issue is not whether the jury was properly instructed as to the law, but whether petitioner received constitutionally adequate assistance of counsel in presenting his case to the penalty jury." Dist.Ct.Op. at 12. A state criminal trial judge instructing the jury that the statute required them to balance the factors, and a reasonably competent attorney for Frey arguing this point (while suggesting on which side the balance should weigh) are two completely different things.[1] The majority fails to come to grips with the reality of how cases are decided in an actual courtroom setting: when the jury hears on summation an argument of the prosecution which is shortly validated by the trial judge, and an incorrect legal argument and no actual analysis by the defense attorney, the defendant's fate is sealed.

The facts of *Woodard v. Sargent*, 806 F.2d 153 (8th Cir.1986) bear a marked similarity to those of the case presently before us. In *Woodard*, the defendant claimed his lawyer was constitutionally ineffective during the penalty phase of his murder trial because counsel failed to secure for his client the benefit of a new mitigating circumstance added to the Arkansas statute before Woodard's case was tried. The factor added to the statute which Woodard's counsel failed to present to the jury, although it was applicable, was lack of a prior history of significant criminal activity. The court found the omission "serious and important," noting that "[t]he whole

---

1. Moreover, in assessing the possible prejudice which may have resulted from counsel's error as to the applicable law, we must examine counsel's performance as a whole at the penalty phase. *See King v. Strickland*, 714 F.2d 1481, 1491 (11th Cir.1983), *vacated on other grounds*, 467 U.S. 1211, 104 S.Ct. 2651, 81 L.Ed.2d 358 (1984); *Mathis v. Zant*, 704 F.Supp. 1062, 1064 (N.D.Ga.1989) (typically, ineffective assistance is shown through combination of weak closing argument and failure to present mitigating evidence). The majority concludes that counsel's

"defense of Roderick Frey at the death penalty phase was an undeniably powerful and emotional presentation by a skilled advocate." Maj. Op. at 358. I do not agree. The general weakness of counsel's closing must be considered in conjunction with the total and appalling failure to present and argue applicable mitigating factors. How the majority can characterize an argument as "powerful and emotional" when the argument is not even addressed to the law which the jury will shortly hear charged by the trial judge completely escapes me.

question of the death penalty depends, under Arkansas law, on the jury's discretion in weighing aggravating and mitigating circumstances." *Id.* at 157.

Because "[a] finding of a mitigating circumstance should have been an important objective in Woodard's case, and the failure to seek the inclusion of this obvious mitigating circumstance certainly fell below the threshold of reasonably competent assistance," the court concluded that the first prong of *Strickland* was satisfied. *Id.* The court also found the error prejudicial under *Strickland's* second prong. The court based its conclusion as to prejudice, in part, on the fact that the first vote taken by the jury was seven to five.[2] However, the court was clearly troubled by the magnitude of the error committed and concluded that "there is a reasonable probability, in the *Strickland* sense, that the outcome of the case would have been different had the jury known of this clearly applicable mitigating circumstance." *Id.* at 158.

Like the court in *Woodard,* I would conclude that the failure of counsel to present all of the applicable mitigating factors and to argue that they outweighed the single aggravating factor, was error resulting in prejudice sufficient to satisfy *Strickland's* second prong.

> The sentencing stage of any case, regardless of the potential punishment, is "the time at which for many defendants the most important services of the entire proceeding can be performed." *ABA Standards on the Administration of Criminal Justice, Sentencing Alternatives and Procedures* § 5.3(e). The special importance of the capital sentencing proceeding gives rise to a duty on the part of defense counsel to be prepared for that crucial phase of the trial.

*Stanley v. Zant*, 697 F.2d 955, 963 (11th Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2667, 81 L.Ed.2d 372 (1984).

In conclusion, I can think of few "errors" more egregious than defense counsel acting under a complete misapprehension of the applicable law at the penalty phase. The mistake most certainly "undermines [my] confidence in the outcome." *Id.* at 694, 104 S.Ct. at 2068. Here, no arguments were made to the jury *on the defendant's behalf* as to applicable mitigating circumstances. In my view this deprived the defendant of the only chance he had for a sentence of life instead of death. Unlike the majority I think it is more than "theoretically possible," Maj.Op. at 350, that the jury would have sentenced Frey to life imprisonment if he had had effective assistance of counsel.

Frey is a loathsome and despicable human being. As the jury decided following the guilt phase of his trial, he surely deserves, at the least, to spent the remainder of his days in jail for the unconscionable crime he committed. But whether he should also suffer death has never been properly adjudicated by a jury which had the question competently and fairly placed in its hands. I would affirm the order of the district court granting a writ of habeas corpus.

---

**2.** It took the jury in this case five and a half hours to return its verdict following the penalty phase. While the majority states that this is a notably short period of time, I would point out that the timing suggests that the vote was not unanimous the first or even the second time around.